Exhibit 1

## REPUBLIC OF THE MARSHALL ISLANDS
## OFFICE OF THE REGISTRAR OF CORPORATIONS

## CERTIFICATE OF INCORPORATION

I HEREBY CERTIFY that

### CHEMNAV SHIPMANAGEMENT LTD.

is duly incorporated and has filed articles of incorporation under the provisions of the Marshall Islands Business Corporations Act on

**July 4, 2006**

WITNESS my hand and the official seal of the Registry on **July 4, 2006**.



Deputy Registrar

19383

Exhibit 2

 CHEMNAV SHIPMANAGEMENT LTD

to main page     send e-mail

**home**

**about us**

**services**

**fleet**

**contact us**

## CHEMNAV SHIPMANAGEMENT







| vessel | Year/Country built | DWT | Hull | Cargo Tank Coating |
|--------|--------------------|-----|------|---------------------|
| Commencement | 2008/S.korea | 13.000 | DH | Phenolic Epoxy |
| Lynx | 2008/S.korea | 13.000 | DH | Marine Line |
| Polaris | 2009/S.korea | 13.000 | DH | Marine Line |
| Saturn | 2009/S.korea | 13.000 | DH | Marine Line |

Legal Disclaimer                          © 2008 CHEMNAV Inc. All right reserved | created by intros.gr

Exhibit 3

# "M/T LYNX"
## <u>Commercial Marketing &</u>
## <u>Chartering</u>
## <u>Agency Agreement</u>

**THIS AGREEMENT** dated **31 March 2009**

**BETWEEN:**

### CAMELA NAVIGATION INC

### AND

### CHEMNAV SHIPMANAGEMENT LTD.
(Hereinafter described as The Manager)

(together "the Parties")

The Manager wishes to be appointed as the Principal's agent for providing commercial management and marketing services in relation to Specified Vessel(s) from time to time under the Principal's ownership or control. The parties wish to record their agreement for their future relationship and their respective rights and obligations.

The Parties mutually agree:

## Clause 1 - INTERPRETATION

**1.1**    **Definitions** — In this Agreement, capitalized terms mean:

(a)   "**Agreement**" means this agency agreement as amended, supplemented, restated and replaced from time to time in accordance with its provisions.

(b)   "**Parties**" means collectively the Principal, and the Manager, and "Party" means any one of them.

(c)   "**Specified Vessel(s)**" means the vessels set out in Annex A of this agreement. Specified Vessel(s) may be added from time to time to Annex A, by way of written request from the Principal and acceptance by the Manager. Specified Vessel(s) may be removed from Annex A by written notice from the Principal only. All additions and removals from Annex A are to be recorded by separate addendum to this contract.

**1.2**    **Construction** — This Agreement has been negotiated by each Party, and any rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not apply to the construction or interpretation of this Agreement.

## Clause 2 - APPOINTMENT OF THE MANAGER

**2.1**    With effect from the date of the Agreement above and continuing unless and until terminated as provided herein, the Principal hereby appoints the Manager, as its exclusive Commercial Marketing and Chartering Manager in relation to the Specified Vessel(s), as documented in Annex A to this Agreement and subsequent agreed amendments to Annex A.

**2.2**    **Basis of Agreement** — Subject to the terms and conditions herein provided, during the period of this Agreement, the Manager shall carry out exclusive Commercial Management, Marketing and Chartering Services (described as "Commercial Management Services" hereinafter), in respect of the Specified Vessel(s) documented in Annex A or agreed subsequent amendment(s), as agents for and on behalf of the Principal. All authorized actions taken by the Manager in order to perform this Agreement will be done in accordance with sound ship commercial management, marketing and chartering practice.

Provided however that the Manager in performance of its role pursuant to this Agreement shall be entitled to give regard to its overall responsibility in relation to all vessels as may from time to time be entrusted to the Manager and in particular, but without prejudice to the generality of the foregoing, the Manager shall be entitled to allocate available supplies and manpower on behalf of the Principal in such manner as in the prevailing circumstances, the Manager in its absolute discretion considers to be fair and reasonable. The Principal reserves the right to ascertain how this discretion has been used and request appropriate remedy if it believes insufficient resources have been allocated.

**2.3**    Subject to the terms and conditions herein provided, during the period of this Agreement, the Manager shall carry out, as agents for and on behalf of the Principal, the following functions:

(a)   Commercial Management of the Specified Vessel(s) documented in Annex A (or subsequent agreed amendment(s)).

(b)   When requested the Sale and Purchase of Specified Vessel(s)

(c)   General Administration

## Clause 3 - COMMERCIAL MANAGEMENT

**3.1**    The Manager shall provide the commercial operation of the Specified Vessel(s), in accordance with the Principal's instructions, which includes, but is not limited to, the following functions:

(a)    Providing chartering services including, but not limited to, seeking and negotiating employment for the Specified Vessel(s) and the conclusion (including the execution thereof) of charter parties or other contracts relating to the employment of the Specified Vessel(s). If such a contract exceeds the Principal's initial guidelines, as documented in Annex B to this Agreement, consent thereto shall be obtained from the Principal.

(b)    Arranging the proper payment to the Principal and or their nominees of all hire and/or freight revenues or other moneys of whatsoever nature, to which the Principal may be entitled arising out of the employment of, or otherwise in connection with the Specified Vessel(s).

(c)    Communicating with the Specified Vessel(s), including the issuing of voyage orders.

(d)    Providing post fixture administrative services including but not limited to dead freight and demurrage claims.

(e)    If required, the Principal is to provide the Manager with any additional marketing literature/brochures with vessels specifications for additional marketing of Specified Vessel(s).

(f)    Any other commercial service required by the Principal in relation to the Specified Vessel(s) provided it is mutually agreed in advance.

## Clause 4 - SALE OR PURCHASE OF VESSELS

**4.1**    Whenever so requested by the Principal, the Manager shall, in accordance with instructions from the Principal, supervise the sale or purchase of the Specified Vessel(s), including the negotiation, implementation and performance of any sale or purchase agreement.

## Clause 5 - GENERAL ADMINISTRATION

**5.1**    The Manager shall handle and settle, with agreement from the Principal, all demurrage and deadfreight claims arising out of the Commercial Management Services, hereunder and keep the Principal informed regarding any incident of which the Manager becomes aware, which gives or may give rise to claims or disputes involving third parties.

**5.2**    The Manager shall, if instructed by the Principal, bring or defend actions, suits or proceedings in connection with matters entrusted to the Manager according to this Agreement.

**5.3**    If instructed by the Principal, the Manager shall also obtain legal or technical or other outside expert advice in relation to the handling and settlement of claims and disputes or all other matters affecting the interests of the Principal in respect of the Specified Vessel(s).

**5.4**    Any additional costs reasonably incurred by the Manager in carrying out its obligations pursuant to this Agreement which are considered to be outside of the normal costs incurred in carrying out their obligations shall be presented to the Principal for its agreement and payment.

## Clause 6 - MANAGEMENT FEES AND EXPENSES

**6.1**    The Principal shall pay to the Manager for its Commercial Management Services, as the Manager under this agreement, ▉▉▉▉▉▉▉▉▉▉▉▉▉ per Specified Vessel documented in Annex A to this Agreement (the "Daily Management Fee").

**6.2**    The Manager, as agents on behalf of the Principal, shall be entitled to commission for services provided as documented below:

   (a)    Spot Charters/Contracts of Affreightment/Trip Time Charters    

   (b)    Bareboat or Time Charters    

   (c)    Where agreed - Sale & Purchase (of sale/purchase price)    

   (d)    The same commission as to Spot Charters and Contracts of Affreightment will also be calculated on Freight, Dead-freight, Demurrage etc.

   (e)    Such commission shall be calculated as per standard chartering practice.

**6.3**    All fees and commissions arranged under this Agreement ("The Management Fees and Commissions") shall commence on the date on which the Manager is appointed to manage the Specified Vessel(s) as documented in Annex A, and subsequent addendums to Annex A, and continue to be honoured until the end of the charters and option periods thereto. Commissions on all Commercial Management Services negotiated by the Manager will continue to be paid to the Manager, whilst such Commercial Management Services remain in place, even if this Agreement has been otherwise terminated.

**6.4**    In the event of the appointment of the Manager being terminated by the Principal in accordance with the provisions of Clause 13 other than by reason of default by the Manager, the Management Fees and Commissions payable by the Principal in accordance with the provision of Clause 6 shall continue to be payable until completion of existing Commercial Management Services.

**6.5**    If a Specified Vessel(s) is lost, sold or otherwise disposed of, the Management Fees and Commissions payable by the Principal, in accordance with the provisions of Clause 6 shall continue to be paid until the Principal ceases to be the registered or disponent Owner of the Specified Vessel(s).

**6.6**    Whilst this Agreement remains in subsistence, if the Principal decides to lay-up a Specified Vessel(s) and such lay-up lasts for more than three months, an appropriate reduction of the Daily Management Fee for the period exceeding three months until one month before the Specified Vessel(s) is again put into service shall be mutually agreed between the parties.

**6.7**    All discount and commissions obtained by the Manager in the course of the Commercial Management Services of the Specified Vessel(s) shall be credited to the Principal.

## Clause 7 - THE MANAGER'S OBLIGATIONS

**7.1** The Manager undertakes to provide the agreed Commercial Management Services, as agents for and on behalf of the Principal, in accordance with sound management practice and to protect and promote the interests of the Principal in all matters relating to the provision of services hereunder.

**7.2** The Manager undertakes not to do or permit anything to be done which might cause any breach or infringement of the laws and regulations of the country of registry of the Specified Vessel(s), or the places where such Specified Vessel(s) may trade.

**7.3** The Manager undertakes to appoint competent independent contractors or employees or agents to carry out any of the obligations expected of them.

**7.4** The Manager will instruct Charterers to pay all hire and/or freights and/or demurrage to the relevant bank account for the specified vessel.

## Clause 8 - THE PRINCIPAL'S OBLIGATIONS

**8.1** The Principal shall pay all sums due to the Manager punctually, in accordance with the terms of this Agreement.

**8.2** The Principal shall reimburse promptly all expenses incurred by the Manager on behalf of the Principal.

**8.3** The Principal shall provide accurate details about the Specified Vessel(s) documented in Annex A to the Manager.

## Clause 9 - GENERAL AGREEMENT

**9.1** This Agreement, along with its Annex A and Annex B, constitutes the entire Agreement of the Parties and encompasses all past and present written and oral agreements and supersedes all prior agreements; and, no statements, promises, or inducements made by either Party or Agent that are not contained in this Agreement shall be valid or binding.

**9.2** This Agreement may not be enlarged, modified, altered, or otherwise amended except in writing, signed by the Parties hereto.

**9.3** The invalidity or unenforceability of any particular provision of this Agreement, or portion thereof shall not affect the other provisions or portions thereof; and, this Agreement shall be construed in all respects as if any such invalid or unenforceable provisions or portions thereof were omitted and this Agreement shall remain in full force and effect.

## Clause 10 - RESPONSIBILITIES

**10.1** Force Majeure – Neither the Principal nor the Manager shall be under any liability for any failure to perform any of their obligations hereunder by reason of any cause whatsoever of any nature or kind beyond their reasonable control. If the Force Majeure in question prevails for continuous period in excess of six months, the parties shall enter into bona fide discussions with a view to alleviating its effects, or to agreeing upon such alternative arrangements as may be fair and reasonable.

**10.2**   Liability to the Principal  - Without prejudice to the above Force Majeure clause, the Manager shall be under no liability whatsoever to the Principal for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect, (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Specified Vessel(s) and howsoever arising in the course of performance of the Management Services UNLESS same is proved to have resulted solely from the negligence, gross negligence or wilful default of the Manager or its employees, or agents or sub-contractors employed by them in connection with the Specified Vessel(s), in which case (save where loss, damage, delay or expense has resulted from the Manager's personal act or omission committed with the intent to cause same or recklessly and with knowledge that such loss, damage, delay or expense would probably result) the Manager's liability for each incident or series of incidents giving rise to a claim or claims shall never exceed a total of 3,650 (three thousand six hundred and fifty) times the fixed daily management fee payable hereunder for the Vessel involved in the incident.

**10.3**   Indemnity - Except to the extent and solely for the amount therein set out that the Manager would be liable under sub-clause 11.2, the Principal hereby undertakes to keep the Manager and its employees, agents and sub-contractors indemnified and to hold them harmless against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them or incurred or suffered by them arising out of, or in connection with the performance of the Agreement, and against and in respect of all costs, loss, damages and expenses (including legal costs and expenses on a full indemnity basis) which the Manager may suffer or incur (either directly or indirectly) in the course of the performance of this Agreement.

> Subject to compliance by the Manager with its obligations under this Agreement, the Principal shall further indemnify the Manager, its employees, agents and sub-contractors (including, but without limitation, all costs and expenses which the Manager may incur in defending any proceedings) which it may incur by reason of it being held out as the Principal's agent or otherwise in the proper performance of duties under this Agreement.

**10.4**   "Himalaya" - It is hereby expressly agreed that no employee or agent of the Manager (including every sub-contractor from time to time employed by the Manager) shall in any circumstances whatsoever be under any liability whatsoever to the Principal for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part, while acting in the course of or in connection with his employment and, without prejudice to the generality of the foregoing provisions in this clause, every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defence and immunity of whatsoever nature applicable to the Manager or to which the Manager is entitled hereunder shall also be available and shall extend to protect every such employee or agent or subcontractor of the Manager acting as aforesaid and for the purpose of all the foregoing provisions of this Clause, the Manager is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be their servants or agents from time to time (including sub-contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this Agreement.

## Clause 11 - DURATION OF THE AGREEMENT

**11.1**   This Agreement shall come into effect as of the date this agreement was signed. Thereafter, it shall continue until terminated by either party giving to the other, notice in writing, in which event the Agreement shall terminate upon the expiration of a period of three months from the date upon which such notice was given.

## Clause 12 - TERMINATION

**12.1**   The Principal's default

    (a)   The Manager shall be entitled to terminate the Agreement with immediate effect by notice in writing if any moneys payable by the Principal under this Agreement shall not have been received into the Manager's nominated account within ten running days of receipt by the Owners of the Manager's written request, or if the Specified Vessel(s) are repossessed by the Mortgagees.

    (b)   If the Principal proceeds or continues to employ any Specified Vessel(s) in the carriage of contraband, blockade running, or in an unlawful trade, or on a voyage which in the reasonable opinion of the Manager is unduly hazardous or improper, the Manager may give notice of the default to the Principal and, requiring them to remedy it as soon as practically possible. In the event that the Principal fails to remedy it within a reasonable time to the satisfaction of the Manager, the Manager shall be entitled to terminate the Agreement with immediate effect by notice in writing.

**12.2**   The Manager's default

If the Manager fails to meet its obligations under this Agreement for any reason within the control of the Manager, the Principal may give notice to the Manager of the default, requiring the Manager to remedy it as soon as practically possible. In the event that the Manager fails to remedy it within a reasonable time to the satisfaction of the Principal, the Principal shall be entitled to terminate the Agreement with immediate effect by notice in writing.

**12.3**   Extraordinary Termination

This Agreement shall terminate forthwith in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise that for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.

**12.4**   The termination of this Agreement shall be without prejudice to all rights accrued due between the parties prior to the date of termination.

## Clause 13 - GOVERNING LAW, JURISDICTION AND ARBITRATION

**13.1**   This Agreement and any difference and/or dispute arising from or in relation to this Agreement shall be governed by, and interpreted and enforced in accordance with English Law.

**13.2**   Arbitration

Any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory

modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD50, 000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

In cases where the claim or any counterclaim exceeds the sum agreed for the LMAA Small Claims Procedure and neither the claim nor any counterclaim exceeds the sum of US$400,000.00 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Intermediate Claims Procedure current at the time when the arbitration proceeding are commenced.

Where the reference is to three arbitrators the procedure for making appointments shall be in accordance with the procedure for full arbitration stated above

## Clause 14 -NOTICES

**14.1**   Any communication may be sent by telefax or email or registered mail or recorded mail or by personal service.

**14.2**   The address of the Parties for service of such communication shall be as follows:

The Principal
Camela Navigation Inc
c/o Ioannis Vekris
9 Neofytou Varna Street 10674
Athens Greece


The Manager
Chemnav Shipmanagement Ltd.
Roupel 6, Kifissia Athens, Greece
admin@chemnav.gr
Tel: +30210 6200975

For and on behalf of
Camela Navigation Inc

Signed ....................... 

Dated ........................

For and on behalf of
Chemnav Shipmanagement Ltd.

Signed ........................

Dated ........................

<u>Annex A to the Agreement – Details of Vessel(s)</u>

| Name | Build Year |
|------|-----------|
| LYNX | 2008 |



<u>Annex B to the Agreement – The Principal's Guidelines:</u>

1. The Manager will not undertake the following types of employment for any vessel without the prior approval of the Principal
   a. Contracts of Affreightment
   b. Bareboat charters
   c. Time charters exceeding 90 days

2. The Manager will consult with the Principal concerning potential charterers and the Principal will confirm his acceptance of such charterer as soon as practical following such notification prior to the Manager fixing firm.

Exhibit 4



**V.Ships Limited**
*V.Ships House*
*13 Omonia Avenue*
*P.O.Box 57115*
*3312 Limassol, Cyprus*
*Ph : +357 25 848400*
*Fax: +357 25 560170*
*Telex 4707 VSHIP CY*
*Marinos.Sekkides@ vships.com*
*www.vships.com*

Limassol 14th May  2010

## To whom it may concern

We hereby confirm that the vessel **m/t Lynx (IMO nr.9388223)** with registered Owners being Camela Navigation Inc is within V.Ships Limited management since 27th of October 2008.

Yours faithfully

M.Sekkides
V.Ships Limited
Insurance Manager.



Exhibit 5



# Lloyd's MIU

The premier source of maritime information

## Lynx

| | |
|---|---|
| **IMO:** | 9388223 |
| **Flag:** | Marshall Islands |
| **Reg. Owner:** | Camela Nav. Inc. |
| **Type:** | Combined Chemical And Oil Tanker |
| **Status:** | Live |

## Vessel Overview

Details of the vessel including registration, dimensions, ownership and other characteristics...updated 24/7

| | |
|---|---|
| **Name** | Lynx |
| **IMO** | 9388223 |
| **Status** | Live |
| **Flag** | Marshall Islands |
| **Type** | Combined Chemical And Oil Tanker |
| **Year of build** | 2008 |
| **DWT** | 13117 |
| **GT** | 8542 |
| **Contact** | Chemnav Inc. |
| **Hull Type** | DH |

## Registration (Name, Flag, Callsign, IMO, MMSI)

| | |
|---|---|
| **Name** | Lynx since: 28 Jul 2008 |
| **Flag** | Marshall Islands , From: 14 October 2008 |
| **Callsign** | V7PE4 |
| **IMO** | 9388223 |
| **MMSI** | 538 003213 |
| **Port of Registry** | Majuro |

## Tonnages (GT, Net DWT)

| | |
|---|---|
| **GT** | 8542 |
| **Net** | 4117 |
| **DWT** | 13117 |
| **Formula DWT** | 12469 |

| Tonnage History | From | Until | GT | Net | DWT | Formula DWT |
|---|---|---|---|---|---|---|
| | Before 04 Dec 2008 | | 8542 | 4117 | 13117 | 12469 |
| | Before 01 Apr 2006 | Before 03 Dec 2008 | 8562 | 4095 | 13022 | 12469 |

## History (Construction Details, Launch Details)

| Construction | | |
|---|---|---|
| | Yard Number: | 1165 |
| | Built By: | Sekwang Heavy Industries Co. Ltd |
| | Built At: | Ulsan |
| | Ordered: | Before 01 Apr 2006 |
| | Scheduled: | In the month of 01 Oct 2008 |
| | Construction start: | 20 Mar 2008 |
| | Construction end: | 27 Oct 2008 |
| **Launch** | Launched: | 28 Jul 2008 |
| | First Movement: | n/a |

## Dimensions (Breadth, Depth / Draught, Length)

| Breadth | Extreme: | 20.4m |
| | Moulded: | 20.4m |
| Depth / Draught | Depth: | 11.5m |
| | Draught: | 8.7m |
| | Freeboard: | 2812mm |
| Length | Between Perpendiculars: | 120.4m |
| | Registered: | n/a |
| | Overall: | 128.6m |

## Classification & Insurance (Clubs, ISM, ISPS, Societies)

| Clubs | P&I : n/a |
| ISM | Vessel has no current ISM |
| ISPS | Vessel has no current ISPS |
| Class | Class: ABS (Americas)(AB) After 01 Aug 2006 |

## Hull details (Hull Info, Ballast)

| Hull Info | Build Material: | Steel |
| | Deck(s): | 1 |
| | Watertight Compartments: | n/a |
| | Bulkheads: | n/a |
| | Hull Type: | DH |
| | Bulbous Bow: | Y |
| Ballast | Capacity (tonnes): | 5277 |
| | Segregated Capacity (tonnes): | n/a |

## Facilities details (Details on available facilities)

| Pumps | Total: | 14 |
| | Description: FRAMO DEEPWELL | 12 X 300 CBM/HR FRAMO DEEPWELL 2 X 100 CBM/HR SLOP |
| | Capacity (Cubic): | n/a |
| | Capacity (Tonnes): | n/a |
| Tanks | Total: | 14 |
| | Center Tanks: | n/a |
| Tank Capacity | Liquid m³: | 14257 |
| | Deck Tank m³: | n/a |
| | Slop Tank m³: | 694 |
| | Crude Capacity (Barrels): | 88240 |
| | Crude Capacity (Metric): | n/a |
| Coils | Tank Heated Coils: | STAINLESS STEEL |
| Products | Number Of Grades: | 13 |
| | Number Of Lines: | n/a |
| Product Tanks | Wing Tanks: | 12 |
| | Tank Coated: | PHENOLIC EPOXY (SIGMA) |

| Lifting Gear (3) | Number | Type | SWL |
| --- | --- | --- | --- |
| | 1 | Crane | 2.1 |
| | 1 | Crane | 10 |
| | 1 | Crane | 3 |

## Machinery (Engines, Speed, Propellers, Boilers, Generators)

| Engines (1) | Type | Diesel (1) |
| | Power (Kilowatts) | 4440 |
| | Designed by: | B&W Diesel |
| | Built by: | STX Engine Co. Ltd |
| | Built at: | Changwon (KOR) |

| | Position | Cylinders | Bore | Stroke | Fuel | Designation: |
| --- | --- | --- | --- | --- | --- | --- |
| | n/a | 6 | 350 | 1400 | Marine Diesel | 6S35MC-MK7 |
| Primary Fuel Type | Type | | Marine Diesel | | | |

|  | Capacity | 684 |
|---|---|---|
|  | Consumption | n/a |
| **Propellers (1)** | **Number** | 1 |
|  | **Type** | Fixed Pitch |

**Boilers (1)**

| Type | Number | Auxillary | Pressure | MPA | Heat |
|---|---|---|---|---|---|
| Oil Fired | 1 | Auxillary |  | 9 | 0 |

**Generators (3)**

| Generator Number | Power Type | Power | Current AC / DC |
|---|---|---|---|
| 3 | KW | 480 |  |

Lloyd's and the crest are the registered trade marks of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's
This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House, 37–41 Mortimer Street, London, W1T 3JH. Registered in England and Wales Number 3099067