**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| FLAME S.A., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 1:10-CV-00278-RC |
| | § | |
| m/v LYNX, her engines, freights, apparel, | § | IN ADMIRALTY |
| appurtenances, tackle, etc., in rem, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO VACATE**
**WARRANT OF ARREST AND IN SUPPORT OF CROSS MOTION TO AMEND**
**COMPLAINT TO PROVIDE FOR AN ARREST PURSUANT TO RULE B OF THE**
**SUPPLEMENTAL ADMIRALTY RULES**

William R. Bennett, III, Esq.
**BENNETT, GIULIANO, McDONNELL & PERRONE, LLP**
494 Eighth Avenue, 7th Floor
New York, New York 10122
Telephone: (646) 328-0120
Facsimile: (646) 328-0121
wbennett@bgmplaw.com

-and-

Michael K. Eaves, Esq.
**CALVERT EAVES CLARKE & STELLY, LLP**
2615 Calder Ave., Suite 1070
Beaumont, Texas 77702
Telephone: (409) 832-8885
Facsimile:  (409) 832-8886
meaves@calvert-eaves.com

**ATTORNEYS FOR PLAINTIFF, FLAME S.A.**

## INTRODUCTION

**Comes Now**, Flame S. A. (hereinafter "Flame"), by and through its undersigned counsel, and submits this Memorandum of Law, along with the accompanying declarations of William R. Bennett, III, Graeme Lloyd, and Evangelos Astras, together with exhibits[1], in opposition to the motion to vacate the warrant of arrest issued herein.  In addition, Flame respectfully requests that the Court grant it leave to amend its Verified Complaint to include a request for attachment under Rule B of the Supplemental Admiralty and Maritime Rules.

For the reasons set forth below, this Court should deny the motion to vacate the warrant of arrest and grant Flame the right to amend its Verified Complaint.

## PROCEDURAL HISTORY

The filing of the Verified Complaint herein (Exhibit A), arises from Flame's efforts to enforce a Judgment rendered in its favor against Primera Maritime (Hellas) Ltd. (hereinafter "Primera"). To date, inclusive of interest, the Judgment due is in excess of US $5,900,00.00.

On or before September 11, 2008, Flame and Primera entered into a maritime contract called a Forward Freight Swap Agreement ("FFSA").  Primera failed to make the requisite payments under the FFSA.  The sum calculated being due at the time of the breach was US $5,518,094.80.  In or about April 2009, Flame commenced an action in London to recover the amounts due and owing under the FFSA.  On June 18, 2009, the High Court of Justice, Queen's Bench Division, Commercial Court Registry, entered a Judgment for Flame against Primera and ordered that Primera pay Flame a total of US $5,554,271.36.  Pursuant to the Order issued by the High Court of Justice, Queens Bench Division, Commercial Court Registry, Defendant Primera

---

[1] All references to Exhibits herein refer to the exhibits attached to the accompanying Declaration of William R. Bennett, III.

was obligated to pay Flame US $5,518,094.80.  The Order was a final judgment, conclusive and enforceable in England.

On September 23, 2009, Flame commenced a proceeding in the Southern District of New York seeking to have the foreign judgment recognized and enforced.  On March 29, 2010, United States District Court Judge Thomas Duffy, of the Southern District of New York, issued an Order confirming and recognizing the foreign Judgment issued by the High Court of Justice in London, England in favor of Flame and against Primera.  (Exhibit B.)  On March 31, 2010, the Clerk of the Court entered Judgment confirming and recognizing the Judgment issued by the High Court of Justice in London, England in the amount of US $5,554,271.36 together with interest from June 18, 2009 at a rate of eight (8) percent.  (Exhibit C.)  As of the filing of the Verified Complaint, Primera owes Flame in excess of US $5,900,000.00.

## INDICIA OF PRIMERA's ALTER EGO STATUS

Paul Coronis identified himself as a director of Primera in an action entitled Primera Maritime (Hellas) Ltd. v. Industrial Carriers Inc., 08 cv 8660 (S.D.N.Y).  (the Verified Complaint is attached hereto as Exhibit O).  Chemnav Shipbuilding is listed as the manager of the m/v LYNX and shares the same address with Primera.  Camela is the registered owner of the m/v LYNX, registered under the Marshall Island flag of convenience.  As will be demonstrated below, Primera, Chemnav and Camela are all controlled by and are part of the shipping operations owned by Nikolaos and Paul Coronis.

Primera is listed as the ship manager for the m/v LYNX on the Equasis international vessel database.  (Exhibit D.)  Equasis is an initiative led by the European Commission and the French Maritime Commission to help make safety related information on the quality of

individual vessels more easily accessible.  The website provides a database of ships with factual information from public authorities and industry organizations.

Additionally, in the Sea-Web Lloyd's Register of Ships database, Primera is listed as the "Group Name" (i.e., the management) for the fleet of ships that includes the m/v LYNX. (Exhibit E.)  Sea-web is a reliable maritime reference tool, combining comprehensive ships, companies, shipbuilders, fixtures, casualties, port state control, ISM, real-time positions and historic vessel movements data into a single application.  According to the Sea-Web Lloyd's Register of Ships database Primera controls no less than ten (10) ships, including the m/v LYNX. The Sea-Web Lloyd's Register of Ships lists Primera as the parent of Camela Navigation, Inc.

Camela Navigation, Inc. is listed on the Equasis international vessel data base as the registered owner of the m/v LYNX.  (Exhibit D.)  The Marshall Islands Registry maintains a copy of the First Preferred Ship's Mortgage for the m/v LYNX which further establishes that the Coronis Family and/or Primera is the beneficial owner of the m/v LYNX.  (Exhibit F.)  Clause 12.1 of the First Preferred Ship's Mortgage states:

> **Application of provisions of the Facility Agreement.** Clause 33 of the Facility Agreement applies to any notice or demand under or in connection with this mortgage and any notice to the owner under or in connection with this mortgage shall be sent to:
> Camela Navigation Inc.
> Chemnav Inc.
> c/o Primera Maritime Ltd.
> National Road Athens-Lamia
> 6 Roupel Str.,
> 145 64 Kifissia
> Greece
> Attention: Mr. Paul Coronis

There is also a Loan Facility agreement for four (4) tank vessels which establishes that Primera, through the Coronis family, is the beneficial owner of the m/v LYNX.  (Exhibit H.)

Pursuant to Clause 33.2 of the "Tank Vessel" Loan Agreement, entitled ADDRESSES AND COMMUNICATIONS, notice was to be sent to:

> Chemnav Inc.
> c/o Primera Maritime Ltd.
> National Road Athens-Lamia
> 6 Roupel Str.,
> 145 64 Kifissia
> Greece
> Attention: Mr. Paul Coronis

The Loan Facility from HSH Nordbank for US $67.5 million refers to four (4) vessels, including the registered owner of the m/v LYNX, Camela Navigation, Inc. The Corporate guarantor is Chemnav Shipmanagement, an alter ego of the Coronis family. A search of the Chemnav Shipmanagement website yields the same address as Primera, and no identification of the officers, directors or key employees. (Exhibit P.) The Schedule to the Loan Facility lists Primera as the Notify Party and Paul Coronis as the contact person. (ISDA Master Agreement and Schedule is attached as Exhibit G.)

Chemnav Shipmanagement Ltd. was established on July 4, 2006. A proxy of an organizational meeting was issued on July 4, 2006 in favor of Paul Coronis. Paul Coronis appeared for an organizational meeting on July 5, 2006 and appointed himself and his lawyer, Evangelos Bairactaris, as directors. Then, at a meeting of board of directors of July 5, 2006, they were appointed president and secretary-treasurer respectively. Following a meeting of board of directors on March 11, 2008, the establishment of an office in Greece was resolved. An office was established at 6 Roupel Street, Kifissia with the lawful representative being Paul Coronis. The company has undertaken the management of the vessels LYNX, POLARIS, SATURN and COMMENCEMENT. The management declarations issued by the shipowning companies of the

first three vessels were signed by Nikolaos Coronis as director.  The fee to establish Chemnav was paid by Primera.

Under a separate facility agreement entered into in May 2008 (the "Bulk Vessel Facility Agreement"), Primera was listed as the corporate guarantor of various new shipbuilding contracts.  (A copy of the Bulk Vessel Facility Agreement is attached as Exhibit I.)  Under the Facility Agreement, the term "fleet vessels" was defined as all the vessels from time to time owned by members of the Group.  (Exhibit H, p. 9.)  The term "Group", was defined as the "Borrowers, the Corporate Guarantor and any other ship owning companies directly or indirectly owned by any holding company from time to time during the Security Period and "members of the group" shall be construed accordingly."

Again, pursuant to clause 33.2, notices under the Bulk Vessel Facility Agreement were to be given to:

> c/o Primera Maritime Ltd.
> National Road Athens-Lamia
> 6 Roupel Str.,
> 145 64 Kifissia
> Greece

The Facility Agreement dated April 23, 2007, which related to the m/v LYNX, was signed by Evangelos Biaractaris, long-time counsel to Primera and Director of Chemnav. Evangelos Biaractaris signed the Tank Vessel Loan Agreement (Exhibit H) on behalf of **all four (4) shipping companies**.  The Bulk Vessel Facility Agreement dated May 2008 was also signed by Evangelos Biaractaris **for all 9 companies**.  On October 15, 2008, he countersigned on behalf of Primera Maritime (Hellas) Ltd. Paul and Nikolaos Coronis also countersigned the agreement on October 15, 2008.

Accordingly, Paul Coronis, Nikolaos Coronis and Evangelos Biaractaris have all executed financial documents on behalf of Primera, Chemnav and Camela.  Further, according to the Hahos Declaration submitted by Camela, (see ¶ 17), there are four (4) officers of Chemnav, one  being Yanoutsos, who is General Manager and CFO of Chemnav.  Yanoutsos is also listed as being a Primera employee for the years 2007-2009.  (Exhibit Q.)

The corresponding Bulk Vessel ISDA Master Agreement (Exhibit G) required all notices be sent to:

> c/o Primera Maritime Ltd.
> National Road Athens-Lamia
> 6 Roupel Str.,
> 145 64 Kifissia
> Greece

As demonstrated above, there is clearly a comingling of assets, funds, management personnel or ownership among Primera, Chemnav and Camela. While the three companies may be separate on paper, they are undeniably alter egos of each other and of Paul Coronis in practice.

## THE ENGLISH COURT FOUND THAT PRIMERA WAS DISSIPATING ASSETS

On May 16, 2008, Primera entered into a FFSA agreement with TMT Asia Ltd.  Under that contract Paul Coronis was the contact for Primera.  On October 6 and October 16, 2009, Paul Coronis, in an attempt to dissipate and hide assets from Primera's creditors, entered into an agreement with Meadway to hide monies due Primera from TMT.  (Exhibits L and M.)  In particular, Primera, by and through Paul Coronis, directed that the money due from TMT be paid by Meadway into an account belonging to Primrose Shipping Ltd., another company controlled by the Coronis family.

Flame, aware that Paul Coronis was entering into deals to dissipate the assets of Primera, petitioned the English Court for a worldwide freezing order.  The English Court granted Flame's request on October 16, 2009.  The order provided that Primera was not to dispose of assets, including monies to be paid by TMT to Primera.  The worldwide freezing order was maintained by the English Court at a hearing on October 30, 2009.  The English Court ordered that monies due to Primera under the TMT FFSA contract, were to be held by Primera's London Counsel.

At the October 30, 2009 hearing, the English Court commented ". . . for the reason given in the [Flame's] skeleton argument, <u>I am, as I said earlier, extremely skeptical about the commercial bona fides of some of the transactions given, in particular the role played by Primrose</u>. . . . it seems to me clear [Flame] should have their money." Primera was directing TMT/Meadway to pay into an account for the benefit of Primrose monies due and owing Primera.  (Exhibits L and M.)

On Monday, March 8, 2010 the English Court held a hearing at which time the Court, speaking to Primera's counsel, stated: "*I am not the slightest bit impressed with anything your clients have done at any stage during this exercise and in the ordinary way, along with Judge Mackie and everybody else, I would continue any freezing injunction for as long as was necessary, because I regard **your clients as having done their utmost to dissipate assets and to avoid legitimate objectives**.*" Speaking for the English Court, Mr. Justice Cook went further and stated "*I have very little doubt that the history of events puts [Primera] in a bad light. It seems to me that they have taken every possible opportunity to avoid making payments under the judgment that has been given against them . . . .*"

The accompanying Declaration of Graeme Lloyd (Exhibit R) outlines in great detail the actions of Primera, through Paul Coronis, to hide and dissipate the assets of Primera.   The Declaration of Graeme Lloyd (Exhibit R) is fully incorporated herein.

The following allegations in the Verified Complaint were not challenged by Camela Navigation:

16. PRIMERA was and or is controlled by the Coronis family, Paul and Nikolaos.

*                              *                              *

22. The Corporate guarantor is Chemnav Shipmanagement, *an alter ego of the Coronis family*.

Simply put, Primera has engaged in a deliberate attempt to defraud Flame and to avoid paying a lawful Judgment by hiding and dissipating assets.   The m/v LYNX is an asset controlled by Primera and its owners, the Coronis Family, and its arrest and detention is lawful.

### POINT I

### THE PURPOSE OF A RULE E(4)(f) HEARING
### IS MERELY TO DETERMINE THE VALIDITY OF THE ARREST

Rule E(4)(f) of the Supplemental Rules provides, in pertinent part:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

Fed. R. Civ. P., Supp. Rule E(4)(f).   <u>Danmar Lines, Ltd. v. Peticure, LLC</u> Slip Copy, 2009 WL 2135794 (N.D. Tex.)   The purpose of a show cause hearing is to enable the court to make a preliminary determination whether reasonable grounds exist for the arrest of the subject property. <u>Danmar Lines, Ltd.</u>, 2009 WL 2135794 (N.D. Tex.) citing <u>Ocean Marine Mutual Ins. Ass'n</u>

8

(Europe) O.V. v. M/V LIA, No. 99-2515, 1999 WL 679671 at *1 (E.D.La. Aug.27, 1999).  At the hearing, the plaintiff must come forward with evidence sufficient to show probable cause for the arrest and that it should be maintained.  See id., 1999 WL 679671 at *1 (citing cases); Danmar Lines, Ltd. 2009 WL 2135794 (N.D. Tex.).

This burden is not onerous.  Plaintiff need only show by a preponderance of the evidence that it is entitled to a valid lien.  Danmar Lines, Ltd., 2009 WL 2135794 (N.D.Tex.), See Seatrade Group N.V. v. 6,785.5 Metric Tons of Cement, No. H-05-2771, 2005 WL 3878026 at *2 (S.D.Tex. Dec.7, 2005) (citing cases).  A Rule E(4)(f)hearing is not intended to resolve the dispute between the parties, but only to make a preliminary determination of whether there are reasonable grounds for issuance of the arrest warrant.  Seatrade Group N.V., 2005 WL 3878026 (S.D.Tex.); Salazar v. Atlantic Sun, 881 F.3d 73, 79-80 (3d Cir.1989); 20th Century Fox, 992 F.Supp. at 1427.

## POINT II

### CONVERSION FROM RULE C ARREST TO RULE B ATTACHMENT IS APPROPRIATE AND WOULD NOT CAUSE PREJUDICE DUE TO THE SHORT TIME THAT HAS ELAPSED.

In Sembawang Shipyard, Ltd. v. Charger, Inc., 955 F.2d 983 (5th Cir. 1992), the plaintiff sought the arrest of a vessel under Rule C after the defendant breached a repair contract.  The district court issued an arrest warrant and the vessel was seized.  The defendant thereafter secured the release of the vessel by posting a bond.  On appeal, the court concluded that the arrest of the vessel was improper because the requirements of Rule C had not been met.  The Court determined, however, that the plaintiff should have proceeded under Rule B and that its failure to do so was merely a technical pleading error.  Because the defendant had not shown that it had been prejudiced by the plaintiff's error, the Court allowed the plaintiff to proceed against

the bond as if the plaintiff had originally proceeded under Rule B.  In effect, the Court allowed the conversion of the Rule C arrest to a Rule B attachment.  See also <u>Heidmar, Inc. v. Anomina Ravennate di Armanento Sp.A.</u>, 132 F.3d 264 C.A.5 (Tex. 1998) (The Court ruled that defendant did not allege that it had suffered any prejudice from the mistake in seeking arrest under Rule C instead of attachment under Rule B and concluded that Heidmar could proceed as if it had originally brought this action under Rule B.)  If a Rule C arrest is converted to a Rule B attachment, the relevant time is the filing of the original Rule C action.  See <u>Heidmar, Inc.</u>, 132 F.3d at 268 (allowing "the conversion of the Rule C arrest to a Rule B attachment to relate back to the original filing of the complaint").

In <u>Caribbean Yacht Works, Ltd.</u>, a defendant alleged that it was improper for the Court to convert the Rule C arrest into a Rule B attachment.  However, the Court held that a Rule C in rem action may be treated as a "technical pleading error" to be corrected by conversion to a Rule B in personam action where "there is no prejudice to the other side." <u>Sembawang Shipyard, Ltd. v. Charger, Inc.</u>, 955 F.2d 983, 989 (5th Cir. 1992); <u>Heidmar, Inc.</u>, 132 F.3d 264, 268 (5th Cir. 1998); <u>Madredeus Shipping Co. Ltd. v. Century Bridge Chartering Co. Ltd.</u>, 2000 WL 1205336, *2 (S.D.Fla. Feb. 11, 2000) (amendment to add Rule B claim made ten days after filing of original complaint was "correction of a technical pleading error [that] will not prejudice the claimant owner"); <u>Dannebrog Rederi AS</u>, 146 F.Supp.2d at 1317 (distinguishes <u>Heidmar</u> from <u>Madredeus.</u>  In <u>Heidmar</u> the "issue of conversion of a Rule C to a Rule B claim was addressed simultaneous or very close to the motions to vacate and prior to appeal").

Here, Plaintiff filed its Rule C action and now moves to amend the complaint for conversion to Rule B less than a week later.  This period of time is a far cry from the "late stage of the litigation" as was the case in <u>Trinidad Foundry</u>, and effectuates little-if any-prejudice on

defendant.   Indeed, the defendant has demonstrated no concrete prejudice from such a conversion "simultaneous or very close to" the Rule C arrest.   Accordingly, the Court should find that the Rule C arrest may be converted to a Rule B attachment at this stage of the litigation.

**POINT III**

**THE EVIDENCE BEFORE THE COURT ESTABLISHES
A PRIMA FACIE CLAIM THAT THE CORONIS FAMILY
CONTROLS PRIMERA, CHEMNAV AND CAMELA.**

Courts may pierce the corporate veil and disregard the separate identity of two corporations when one becomes the conduit of the other, or to prevent manifest injustice to third parties.  A. Coker & Co. Ltd., 1999 WL 311941 (E.D.La.) citing Talen's Landing, Inc. v. M/V Venture, II, 656 F.2d 1157, 1160 (5th Cir. 1981).   Courts consider various factors to determine whether an alter ego relationship exists.   In Sabine Towing & Transp. Co. v. Merit Ventures, Inc., 575 F.Supp. 1442 (E.D.Tex. 1983), the Court listed fifteen of the most commonly considered factors.  It is well-established that this court, as a court of admiralty jurisdiction, has the power to pierce the corporate veil of the defendant corporation.  Sabine Towing & Transp. Co., Inc. 575 F.Supp. 1442 (E.D. Tex. 1983) citing Swift and Co. Packers v. Compania Colombiana Del Caribe, S.A., 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950).

Whether the corporate veil should be pierced depends on the findings of fact in each particular case.  Though case law has developed general rules regarding when a court should exercise its power, each case is sui generis and must be judged within its own context.  Sabine Towing & Transp. Co., 575 F.Supp. 1442 (E.D. Tex. 1983) citing Bordagain Shipping Co. v. Saudi-Arabian Lines S.A., 1979 A.M.C. 1058 (E.D.La.1978) affirmed per curiam 623 F.2d 710 (5th Cir.1980).  Furthermore, though the court may find the law of one particular state, such as

11

Texas, persuasive, the law to be applied in such cases is federal common law.  Sabine Towing &
Transp. Co., 575 F.Supp. 1442 (E.D. Tex. 1983) citing Talen's Landing, Inc., 656 F.2d 1157 (5th
Cir.1981).  See also Edwards Co., Inc. v. Monogram Industries, Inc., 713 F.2d 139 (5th Cir.
1983).

 A trial court must pierce the corporate veil and require a parent corporation to answer for
the debts of a subsidiary when the subsidiary conducts business in a manner that clearly indicates
that the parent is an alter ego of the subsidiary.  Markow v. Alcock, 356 F.2d 194 (5th Cir.
1966).  An alter ego relationship is found when the evidence discloses a pattern of control or
domination of a corporation by an individual or corporation, and that this domination was used to
support a corporate fiction.  Bordagain Shipping, supra at 1072, 623 F.2d 710.  Here, Paul
Coronis engaged in a pattern of control or domination over Primera, Chemnav, Camela and the
other entities that were part of the Group.  Because Flame can establish Paul Coronis' control or
domination, this Court must disregard the corporate entity.  Furthermore, as is the case here, it is
quite clear that the veil should be pierced when it will prevent manifest injustice to third parties.
Talen's Landing, supra at 1160 citing Houston Oil Field Material Co. v. Stuard, 406 F.2d 1052,
1054 (5th Cir. 1969).  Here, the injustice is Paul Coronis being able to avoid the payment of a
lawful Judgment.

 Since each case must be judged on its own facts, no set formula has been created to
decide when an alter ego relationship will be found.  Historically, however, courts have used
some fifteen to twenty-five factors in deciding the issue.  Some courts have carefully delineated
the factors they have used.  See, e.g. Andrew Martin Marine v. Stork-Werkspoor Diesel, 480
F.Supp. 1270 (E.D.La. 1979), Bay Sound Transportation Co. v. United States, 350 F.Supp. 420
(S.D.Tex. 1972).

The <u>Sabine</u> factors are as follows:

1. **Common or overlapping stock ownership between the parent and the subsidiary**. The accompanying Declaration and exhibits clearly establish that there is a common or overlapping stock ownership between Primera, Chemnav and Camela.[2]

2. **Common or overlapping directors and officers**. Paul Coronis and Evangelos Biaractaris are common directors for Primera and Chemnav.[3]

3. **Use of Same Corporate Office**. The common corporate offices are Chemnav Inc. c/o Primera Maritime Ltd. National Road Athens-Lamia 6 Roupel Str., 145 64 Kifissia Greece Attention: Mr. Paul Coronis This factor, present in the instant case, has been cited in several decisions. It is important here, not only because it allowed a great deal of interrelationship between the companies, but because it means third parties could reasonably believe that there was only one company, instead of several.

4. **Inadequate Capitalization of the Subsidiary**. Despite the Coronis family and Primera acting as Guarantors under the Bulk and Tank Vessel Loan Facilities, Primera has attempted to liquidate.

5. **Financing of the subsidiary corporation by the Parent**. Primera acted as the corporate guarantor for the Bulk Vessel Loan Facility to permit its subsidiary companies to purchase vessels. In addition, Paul Coronis was listed as the Notify Party for Camela Navigation under the Tank Vessel Loan Facility.  Further, Evangelos Astras confirmed in his declaration that Primera provides direct financial support to Chemnav.  Mr. Astras declared that Primera paid the establishment fee for Chemnav to conduct business in Greece.  (Exhibit Q, ¶ 5.)

6. **Whether the Parent existed solely as a Holding company for its subsidiaries**. The international shipping databases indicate that Primera was the holding company which existed solely to manage its subsidiaries.

7. **The Parent's use of the subsidiary's property and assets as its Own.** The evidence discloses that the Coronis Family, through Primera, directed loan funds to its sister subsidiaries.  See Loan Facility documentation.  Specifically, evidence developed in the English Court established that Paul Coronis directed monies due Primera to Primrose and Seadance, other companies under the control of Primera and Mr. Coronis.

8. **The Nature of Intercorporate Loan Transactions**. An informality is evident here. Many "loans" were facilitated by Primera/Coronis Family for the benefit of the sister companies.  In fact, Primera has admitted to receiving an interest free loan from a

---

[2] Curiously, neither Declaration submitted by Camela provides a complete list of the officers, directors and shareholders of Camela, Chemnav or Primera.

[3] Neither Declaration submitted by Camela identifies directors of Camela, Chemnav or Primera. The absence of such identification infers that the disclosure would establish the Coronis Family acted as directors.

company known as JPC Investments, which Graeme Lloyd theorized in his declaration may stand for John Paul Coronis Investments. (Exhibit R, ¶ 11.) An interest free loan is clear evidence that the transaction was not performed at arm's length.

9. **Incorporation of the Subsidiary being caused by the Parent**. This factor is present without question in the instant case.

10. **Whether the Parent and the Subsidiary file Consolidated Income Tax Returns.**

11. **Decision-Making for the Subsidiary made by the Parent and its Principals.** Evidence developed in the English Court established that Paul Coronis directed monies due Primera to Primrose and Seadance, other companies under the control of Primera and Mr. Coronis. Thus, the evidence bears out that Paul Coronis and Primera exercise decision-making authority over the subsidiary companies.

12. **Whether the Directors of the Subsidiary act Independently in the Interest of the Subsidiary or in the Interest of the Parent**. This is a significant factor here, because of the duplication of directors among the Primera Group of Companies. It is apparent that Chemnav, Camela and Primera acted on the orders Paul Coronis.

13. **The Making of Contracts between the Parent and the Subsidiary that are more favorable to the Parent.**

14. **Observance of Formal Legal Requirements.** It cannot be stated with certainty whether Primera, Chemnav and Camela observed all the formal legal requirements expected of a corporation. However, given Paul Coronis' direct involvement with all three companies, discovery would likely yield a finding that corporate formality was not followed on all occasions.

15. **The Existence of Fraud, Wrong-doing or Injustice to Third Parties**. As noted by the English Court, the Coronis Family has acted in bad faith in failing to pay the debt owed to Flame by Primera. Certainly the circumstances indicate that the maneuverings of Paul Coronis were designed to keep Flame from reaching Primera's assets.

None of the above factors alone is to be determinative. The real question is, given all the factors, would fundamental injustice be done to the creditors if the veil were not pierced? This is unquestionably the case here.

## POINT IV

## DISCOVERY IS WARRANTED

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir. 2006), strongly suggested that courts should limit their Rule B inquiries to whether the plaintiff has stated a prima facie basis for the maritime attachment at issue.  See Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S. Dist. LEXIS 60770, *1 (S.D.N.Y. 2006) (referring to Order dated August 15, 2006); see also Wajilam Exports PTE Ltd. v. ATL Shipping Ltd and Sistina Shipping Ltd., 2006 WL 3019558 (S.D.N.Y.), No. 05 Civ. 7955, *1 (plaintiff should not be required to prove its case in order to defeat a motion to vacate-*discovery has not been had and it would defeat the purpose of a Rule B maritime attachment to require a plaintiff asserting a valid prima facie maritime claim to prove that the facts in the complaint are true*) (citing Japan Line, Ltd. v. Willco Oil, Ltd., 424 F.Supp. 1092, 1094 (D.Conn. 1976)).  Thus, after Aqua Stoli, it appears that courts should simply consider whether a plaintiff seeking to maintain a maritime attachment has pled a prima facie case justifying that attachment under Rule B.  Ullises Shipping Corp. v. FAL Shipping Co., 415 F.Supp.2d 318, 322-23 (S.D.N.Y. 2006) (a plaintiff asserting corporate alter ego need not definitively establish domination and control, but must present enough evidence to convince the court that there are reasonable grounds for piercing the corporate veil).  Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1989) (holding, in "alter ego" cases, that "generally a plaintiff may be allowed discovery with respect to the jurisdictional issue").

In Allan v. Brown & Root, Inc., 491 F.Supp. 398 (D.C. Tex. 1980) the gravamen of plaintiff's argument was that proper discovery will reveal the existence of such a close and

interrelated course of operations between the defendants, where for all practical purposes entities are but operating divisions or alter egos of each other.  Plaintiff was granted discovery.

Here, discovery will confirm that Paul Coronis controls Primera, Chemnav, Camela and the other companies listed in the loan facility documents.

In <u>Seema Gems, Inc. v. Shelgem, Ltd.</u>, 1994 WL 86381 (S.D.N.Y. 1994), defendant moved to dismiss plaintiff's complaint pursuant to Rule 12(b) on the ground that it fails to state a claim upon which relief may be granted.  A complaint should be not be dismissed for failure to state a claim " 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' "  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).  Although plaintiff's claim was poorly articulated, the facts alleged suggested that plaintiff might have been entitled to recovery against defendant if plaintiff's "alter ego" and "successor in interest" allegations were true.  The adequacy of plaintiff's complaint against defendant was therefore bound up with the question of the relationship between defendant parties.  The Court held that because of the close relationship between the two questions, and because the ordered discovery may enable plaintiff to amend its complaint, dismissal of plaintiff's complaint against a defendant for failure to state a claim was deemed premature.  Gemset's Rule 12(b)(6) motion was therefore denied without prejudice to its renewal after the close of discovery.

## POINT V

### CAMELA NAVIGATION IS NOT ENTITLED TO COUNTERSECURITY, ATTORNEY'S FEES OR COSTS.

Rule E(7) provides in relevant part:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must

give security for damages demanded in the counterclaim unless the court for
cause shown, directs otherwise. Proceedings on the original claim must be stayed
until this security is given unless the court directs otherwise.

Supplemental Rules for Certain Admiralty and Maritime Claims R. E(7)(a).

The purpose of this rule is "to place the parties on an equality as regards security."
Seatrade Group N.V. 2006 WL 126711 (S.D. Tex.) citing Washington-Southern Navigation Co.
v. Baltimore & Philadelphia S.B. Co., 263 U.S. 629, 638-39, 44 S.Ct. 220, 68 L.Ed. 480 (1924)
(construing former Admiralty Rule 53). Although the language of the rule is automatic, it is not
absolute; the original seizing complainant may be excused by the court "for cause shown."
Seatrade Group N.V., 2006 WL 126711 (S.D. Tex.) citing Titan Navigation, Inc. v. Timsco, Inc.,
808 F.2d 400, 403 (5th Cir. 1987). The determination of "for cause shown" is relegated to the
sound discretion of the trial court. In exercising that discretion, a court should consider whether
the posting of countersecurity will prevent the plaintiff from prosecuting its claims, whether the
countersecurity involves the release of seized property, whether the counterclaim is frivolous,
whether the counterplaintiff could have proceeded in rem and the potential injustice of requiring
one party to post security while the other party does not. Seatrade Group N.V., 2006 WL
126711 (S.D. Tex.); Afram Lines Int'l, Inc. v. The M/V Capetan Yiannis, 905 F.2d 347 (11th Cir.
1990); Result Shipping Co. v. Ferruzzi Trading USA, 56 F.3d 394 (2d Cir. 1995).

"[A] counterclaim 'arising out of the same transaction or occurrence' as the original
claim is a prerequisite to the posting of counter-security under Rule E(7)." Seatrade Group N.V.
2006 WL 126711 (S.D. Tex.) citing Incas & Monterey Printing & Packing, Ltd. v. M/V Sang
Jin, 747 F.2d 958, 960 n. 6 (5th Cir. 1984). The plain language of Rule E(7) provides for
countersecurity "[w]hen a person who has given security for damages in the original action
asserts a counterclaim that arises from the transaction or occurrence that is the subject of the

17

original action," and limits the amount of the countersecurity to the "damages demanded in the counterclaim...."  Supplemental Rules for Certain Admiralty and Maritime Claims R. E(7)(a). Courts have required a pending counterclaim to consider a related motion for countersecurity. Seatrade Group N.V. 2006 WL 126711 (S.D. Tex) citing Weeks Marine, Inc. v. M/V UNIMASTER, No. 97-1947, 1997 WL 660624, at *3 (E.D.La. Oct.23, 1997) (unpublished opinion) (holding that Rule E(7) "allows for counter-security only when a counterclaim is asserted" and that defendant's motion for countersecurity was moot after the court dismissed its counterclaim).

Courts have held that a counterclaim for wrongful seizure is not an appropriate basis for requiring countersecurity under Rule E(7).  Incas and Monterey Printing and Packing, Ltd. v. M/V Sang Jin, 747 F.2d 958 (5th Cir. 1984).  In Incas, the court held that countersecurity may be required only when a counterclaim is a compulsory counterclaim under Federal Rule of Civil Procedure 13(a).  The court held that a wrongful seizure action does not arise out of the same transaction or occurrence as a breach of contract of carriage action, is not a compulsory counterclaim, and is not the appropriate basis for requiring countersecurity under Rule E(7). Seatrade Group N.V., 2006 WL 126711 (S.D. Tex.).

A plaintiff who causes an arrest will be subject to damages suffered by the wrongful arrest if it is proven that the plaintiff acted in bad faith.  See Frontera Fruit Co. v. Dowling, 91 F.2d 293, 297 (5th Cir. 1937).  The standard for an award was set out in Dolco Inv., Ltd. v. Moonriver Dev., Ltd. 526 F.Supp.2d 451 (S.D.N.Y. 2007) relying on the Court of Appeals decision in Dow Chemical Pacific, Ltd. v. Rascator Mar. S.A., 782 F.2d 329 (2d Cir. 1986), which set forth the standard for the maritime exception to the American rule with respect to an award of attorneys' fees and costs:

18

> While the "American Rule" is that the prevailing party in federal court litigation generally cannot recover attorneys' fees, the court does have the power to award attorneys' fees to a successful litigant <u>when his opponent has commenced or conducted an action in bad faith, vexatiously, wantonly, or for oppressive reasons</u>. To ensure that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, <u>we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts. Whether a claim is colorable, for purposes of the bad-faith exception, is a matter of whether a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts actually had been established</u>. Finally ... [t]here must be clear evidence of bad faith by a particular party before attorneys' fees may be assessed against him.

782 F.2d at 344 (citations, internal quotation marks, and brackets omitted); see also <u>Am. Nat'l Fire Ins. Co. v. Kenealy</u>, 72 F.3d 264, 270 (2d Cir. 1995) (holding that "the award of fees and expenses in admiralty actions is discretionary with the district judge upon a finding of bad faith") (quoting <u>Ingersoll Milling Mach. Co. v. M/V Bodena</u>, 829 F.2d 293, 309 (2d Cir. 1987)).  Under the bad faith standard, neither lack of merit nor improper motive is individually sufficient; a party seeking attorneys' fees and costs must prove both prongs of the test by clear evidence. <u>Dolco Inv., Ltd. v. Moonriver Dev., Ltd</u>. 526 F.Supp.2d 451 (S.D.N.Y. 2007).  See <u>Sierra Club v. United States Army Corps. of Engineers</u>, 776 F.2d 383, 390 (2d Cir. 1985).

Here, there is ample evidence to support Flame's contention that Paul Coronis was the controlling force behind Primera, Chemnav and Camela.  Paul Coronis has tried to dissipate the assets of Primera to avoid paying Flame's Judgment.  Equity dictates that this Court deny Mr. Coronis' continued attempts to avoid the Judgment.

## CONCLUSION

For the reasons stated herein above, the motion to vacate the arrest should be denied and

Plaintiff's cross-motion to amend the complaint granted.


Dated: New York, New York
         May 18, 2010

**CALVERT EAVES CLARKE & STELLY, L.L.P.**

By: _____
Michael K. Eaves
Texas State Bar No.:  00787414
2615 Calder Avenue, Suite 1070
Beaumont, Texas  77702
Telephone: (409) 832-8885, ext. 5702
Facsimile: (409) 832-8886
meaves@calvert-eaves.com
-and-

William R. Bennett, III, Esq.
**BENNETT, GIULIANO, MCDONNELL & PERRONE, LLP**
494 Eighth Avenue, 7th Floor
New York, New York 10122
Telephone: (646) 328-0120
Facsimile: (646) 328-0121
wbennett@bgmplaw.com

**ATTORNEYS FOR PLAINTIFF, FLAME S.A.**