# EXHIBIT R

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| FLAME S.A., | § | C.A. No. 10-cv-00278-RC |
| | § | |
| Plaintiff, | § | IN ADMIRALTY |
| | § | |
| -against- | § | |
| | § | |
| m/v LYNX, her engines, freights, apparel, | § | |
| appurtenances, tackle, etc., in rem, | § | |
| | § | |
| Defendant. | § | |

**DECLARATION OF GRAEME LLOYD**

I, GRAEME LLOYD of St Olave's House, Ironmonger Lane, London, EC2V 8EY, pursuant to 28 U.S.C.A. §1746 declare under the penalties of perjury that the following is true and correct:

**Introduction**

1.  I am a solicitor and a partner in the firm of Winter Scott of the above address and have conduct on behalf of Flame S.A. ("FLAME") of the UK aspects of this litigation.

**The Debt and the UK Judgment**

2.  Primera Maritime (Hellas) Ltd ("Primera") and Flame entered into a Forward Freight Agreement ("FFA") contract dated 11 September 2008 which incorporated the 1992 ISDA Master Agreement. By virtue of Clause 15 of the FFA, the contract is governed by English law and subject to the exclusive jurisdiction of the High Court in London.

3. Primera failed to make payments to Flame as they fell due under that FFA. This amounted to a breach of contract and Flame invoked the early termination provision and claimed for the sums payable.

4. Flame commenced proceedings in the English High Court on 31 March 2009 and obtained judgment in default on 18 June 2009 in the sum of US$5,554,271.36 plus interest.

5. Primera applied to set aside that judgment. By an order of HHJ Chambers QC, sitting as a Judge of High Court, dated 12th August 2009 the application to set aside was dismissed. Pursuant to paragraph 2 of that order, Primera was given an opportunity to pay part of the judgment and to provide security for the remainder. It failed to do so. The default judgment was therefore enforceable as from 4 September 2009. Primera sought permission to appeal although this was refused by HHJ Chambers QC.

6. Primera waited until almost the expiry of the time period within which it could renew its application for permission to appeal before the Court of Appeal. That application was lodged on 2 September 2009. Permission to appeal was refused by the Court of Appeal on 21 October 2009.

7. The entire judgment remains outstanding and interest continues to accrue.

**The concerns of Flame and the procedural history**

8. Under the FFA contract on which the Judgment was based, the bank account stipulated for payments due to the Company was an account in the name of "JPC Investments S.A.".

9. In an attempt to obtain security, Flame commenced proceedings in Greece on or about 21 April 2009 against both Primera and JPC Investments S.A., to arrest/attach monies in Primera's bank account and the account of JPC Investments at the HSBC Bank in Greece. An attachment order was made by the Greek Courts.

10. As I understand it, the position taken by Primera in Greece to challenge the attachment was that the US$1.4 million in the Company's bank account, belonged to (what I understand to be) a related company, Adalia Shipping Company Ltd. It was alleged that the US$1.4million was provided to HSBC to support a pledge. It was never made clear why Primera entered into such an arrangement with Adalia Shipping Company Ltd.

11. As to the JPC account, according to Primera, JPC made an interest free loan to it which is said to explain why funds due to Primera were being paid to JPC Investments. I have previously speculated that JPC might stand for John Paul Coronis. This has been denied.

12. For obvious reasons, Flame was very concerned by Primera's failure to satisfy the judgment and was concerned about how Primera had arranged its affairs. Flame was also concerned as to where incoming funds due to Primera were being paid (ie given that the HSBC accounts were frozen in Greece).

13. On 24 September 2009, Flame sought an order from the UK High Court that Paul Coronis, as a director of Primera, be required to attend Court and provide information about the Company's means and produce certain documents. An application was made to Master Kay in the Queen's Bench Division. An order was granted on 28 September 2009. On 29 September 2009 the order was served on Primera's London Solicitors, DLA Piper UK LLP ("DLA"). On 9 October 2009 my firm received a message from Linos Choo at DLA that his firm was now instructed on behalf of Mr Coronis. As a result of points made by DLA relating to jurisdiction, Flame felt that it could not pursue this avenue any further.

14. On 5 October 2009, Flame issued an application for a third party debt order. That application also gave rise to the disclosure of information which gave Flame further cause for concern. The third party debt order related to sums due by TMT Asia Ltd ("TMT Asia") to Primera arising from FFA contracts entered into with Primera.

15. TMT Asia entered into two FFA contracts with Primera dated 16 May 2008 and 20 May 2008. They incorporated the FFABA 2007 terms and by virtue of Clause 15, the contracts were also governed by English law and subject to the exclusive jurisdiction of the High Court in London.

16. It might be helpful if I explain how an FFA contract usually operates. In essence, an FFA contract is a two way bet on the future movement of freight markets. One party, the seller, bets that the freight rate for a particular voyage by a particular size of vessel will be below the contract rate; the other party, the buyer, bets that it will be above the contract rate. The contract rate is compared on a daily basis with the appropriate market rate as published by the Baltic Exchange. The FFA between the parties provides for monthly cash settlement of the net amounts due between them based on a comparison between the contract rates and the market rate then prevailing. Sometimes a party to an FFA takes an 'opposite position' against another market participant and thereby has some protection against market movements in respect of open freight contracts that he has bought and sold.

17. The third party debt order was intended to affect payments which Flame believed were to be paid to Primera in October, November and December. An interim third party debt order was made by Mr Justice David Steel on 6 October 2009. The order was in standard terms and ordered TMT Asia not to pay Primera (except to the extent the sums exceeded US$5,686,965 and £10,000 (being the sums awarded to Flame).

18. The order was served on TMT Asia during the course of the afternoon/evening of 6 October 2009 on Ince & Co, the solicitors for TMT Asia.

19. On 13 October 2009, TMT Asia filed evidence in opposition to the making of a final order in respect of the third party debt order. The evidence served by TMT Asia confirmed the existence of the FFA contracts with Primera.. The amount due from TMT Asia to Primera for September 2009 was US$709,242.98. One of TMT's objections to the making of the final order was that TMT had already satisfied the debt by way of a three way netting arrangement and payment. The documents exhibited by TMT Asia in support of this ground of opposition gave Flame further cause for concern.

20. Primera had issued an invoice to TMT Asia for the sums due in September 2009. The most striking aspect of the invoice was that it did not ask TMT Asia to pay Primera at all. Rather, a different account was specified in the name of Primrose Shipping Ltd ("Primrose").

21. TMT Asia also provided one further document being an email from Mr Paul Coronis confirming what was said to be a "netting off" agreement between TMT Asia, Primera and another company, Meadway Shipping & Trading ("Meadway"). The email was sent by Mr Coronis to Katy Chen of TMT Asia and a "George" at Meadway. It is timed at 09.29 on 6 October 2009.

22. Under this arrangement, TMT Asia did not have to pay its debt to Primera. Rather, TMT was to deduct US$508,072.46 from its debt to Primera (ie leaving a balance for September of US$201,170.52). In return, Meadway agreed to pay US$406,457.96 to Primera (i.e. Primera accepted a discount of 20%). The balance of the TMT debt to Primera (ie US$201,170.52) was to be paid by TMT Asia.

23. The "deal" was arranged by Mr Paul Coronis on 6 October 2009 (being the day before FFA payments became due for September and the day of the interim third party debt order).

24. By an agreement dated 6 October 2009, between Meadway and Primera, Meadway was to pay US$406,457.96 to Primera in two instalments each of US$203,228.98. Payment of the first instalment was to be made no later than 12 October 2009 and the second instalment, no later than 20 December 2009. The agreement was signed for Primera by Mr Paul Coronis.

25. As a result of this "netting arrangement", the sum due to Primera from TMT was reduced to US$201,170.52. However, that was not paid to Primera at all. Rather, at the request of Mr Paul Coronis and Primera, it was paid to Primrose's account on 7 October 2009.

26. Pursuant to the agreement with Meadway, Primera's invoice to Meadway for the first instalment also gave the Primrose account for payment. Payment was made on 13 October 2009. The day after that, the Primrose account was closed.

27. It was clear from the evidence of TMT Asia in the third party debt proceedings that the "netting arrangement" was not a one off event. TMT Asia identified that it was in

negotiations with Primera and another FFA trading entity for a further "netting off" agreement in respect of future sums it was likely to owe Primera.

28. Flame was concerned that Mr Coronis and Primera were directing payments due to Primera to separate (but possibly related) companies. Given the outstanding judgment against Primera and the freezing/arrest of its accounts in Greece, Flame also believed it was reasonable to conclude that this was being done in order to thwart the freezing/arrest orders in Greece and also to avoid paying the judgment debt obtained by Flame. In the circumstances on 14 October 2009, Flame gave notice to DLA (Primera's UK lawyers) that it was going to seek a freezing injunction. On 15 October 2009, Flame issued an application for a freezing order.

29. After Primera received notice of the application of a freezing injunction, an agreement was reached with Meadway to precipitate the payment of the second instalment. As I have stated above, the second instalment was due on 29 December 2009. However, a further agreement was reached on 16 October 2009 under which Meadway agreed to pay the second instalment to Primera at a further discounted rate of US$185,000. However, Primera insisted that payment had to be made that day (i.e. Friday, 16 October 2009). The further agreement and acknowledgment of safe receipt was signed on behalf of the Company by Mr. Paul Coronis. I understand that the second payment was not made to Primera or to the Primrose account (which had been closed a few days earlier). Rather, payment was made to another company, Seadance Maritime Inc.

30. Flame's application for a freezing order was granted on 16 October 2009. The hearing was on notice and Leading Counsel for Primera was present but he made no submissions on the merits of the application only the terms of the order. The order provided, inter alia, that Primera was not to dispose of or in any way deal or diminish its assets up to US$6,612,942.48. This prohibition included in particular the sum of US$406,457.96 paid or to be paid by Meadway to Primera as evidenced by an email dated 6 October 2009.

31. Having returned from Court, I sent an email to Primera's lawyers, Mr Linos Choo at DLA at 1239 noting that whilst the freezing Order was being drawn up, it was nonetheless effective. I asked Mr Choo to confirm that his clients had been advised

accordingly. I never received a response to that email. It is not clear when the payment by Meadway was made.

32. The hearing for a final order on the third party debt order was heard on 23 October 2009. His Honour Judge Mackie QC set aside the interim order. He did so on the basis that TMT Asia was not within the jurisdiction and also that, with payment by TMT Asia to the Company (even if this was done after service of the interim order) the debt had been discharged.

33. The return date for the freezing order was also 23 October 2009 but there was insufficient time to deal with it at this hearing and it was adjourned to 30 October 2009.

34. On 30 October 2009, Primera's solicitor, Mr Linos Choo of DLA Piper presented a witness statement which attached copies of the invoices issued by Primera to TMT Asia since May 2009. The invoices for January through to April were not disclosed. The May-September invoices (all issued after the commencement of proceedings by Flame) all requested payment to Primrose. The total amounts claimed by Primera in these invoices (plus the October invoice disclosed by TMT Asia and referred to earlier) amounted to US$4,255,174.65. This is evidence that over US$4 million due to Primera was paid to Primrose in the period from 1 May 2009 (after Flame had commenced proceedings in the UK against Primera). This is only one transaction.

35. At the return date, Primera opposed the freezing injunction of the following grounds:

   (1) Primera was a ship management company and on 23 November 2007, Primrose authorised Primera to enter into FFAs on its behalf such that Primrose was an undisclosed principal.

   (2) Paul Coronis was said to have resigned as a director of Primera on 15 November 2008 because remaining actively involved with Primera was not possible;

   (3) The netting arrangements entered into by the Company were part of normal business activities.

36. The worldwide freezing order was maintained by His Honour Judge Mackie QC at the hearing on 30 October 2009. He also ordered that the money due under the TMT contracts should be held by Primera's solicitors in London pending further order. In this judgment His Honour Judge Mackie QC held *"Substantially for the reason given in the claimant's skeleton argument, I am, as I said earlier, extremely skeptical about the commercial bona fides of some of the transactions given, in particular the role played by Primrose.....It seems to me clear the claimants should have their money"*.

37. At that hearing of the freezing injunction on 30 October 2009, Primera asserted it was self evidently insolvent and in order to meet a point raised by Primera that Flame was seeking to prefer itself to other creditors, Flame undertook to commence winding up proceedings in England by 28 January 2010.

38. At the time that undertaking was given, Flame believed that the TMT monies would be paid into an account in England, giving a firm basis for a winding up petition in England. However, as matters turned out, Primera refused to issue an invoice which meant of course, that no funds were paid into the UK. In the circumstances, on 28 January 2010, Flame applied to vary the undertaking to allow Flame to commence winding up proceedings in any appropriate jurisdiction. Notice was given to DLA although before they responded, the Order was granted by His Honour Justice Mackie on 1 February 2010.

39. On 3 February 2010, Primera issued an application to discharge the freezing injunction on the basis that Flame had not issued winding up proceedings and the Court had no jurisdiction to continue the freezing injunction.

40. On 10 February 2010, Flame issued an application in the UK Courts seeking an order that Primera issue and send invoices to TMT Asia or alternatively that a receiver be appointed to receive the monies due from TMT Asia and to release it from its undertaking to issue winding up proceedings. The reason for this application was that it was unclear where it was appropriate to issue winding up proceedings and this was thought the best way to secure the only known asset for the benefit of creditors, and it was clear that, if winding up proceedings were commenced, wherever they were commenced (the options being Greece of England) the jurisdiction of either Court would be disputed by Primera.

41. Primera's application of 4 February and Flame's application of 10 February were listed for hearing on Monday, 8 March 2010.

42. At 1505 on Friday afternoon, 5 March 2010 (and after skeleton arguments had been exchanged), I received an email from Mr. Linos Choo advising that Primera had appointed a Liquidator in Liberia being Mr. H Varney G Sherman. A witness statement from Mr. Varney was also sent. Mr. Varney's first act as Liquidator was to seek the discharge of the freezing injunction.

43. At 1705 on Friday, 5 March 2010, I received a further email from Mr. Choo which enclosed the Liquidator's application for recognition of the Liquidation proceedings in Liberia.

44. On Monday, 8 March 2010, the two applications came before Mr. Justice Cooke in the Commercial Court. In the course of submissions, Mr. Justice Cooke made the following observations to the counsel for Primera/the Liquidator. About the Company he said:

> *"I am not the slightest bit impressed with anything your clients have done at any stage during this exercise and in the ordinary way, along with Judge Mackie and everybody else, I would continue any freezing injunction for as long as was necessary, because I regard your clients has having done their utmost to dissipate assets and avoid legitimate objectives."*

45. In his judgment Mr. Justice Cooke held:

> *"I have very little doubt that the history of events puts the defendants in a bad light. It seem to me that they have taken every possible opportunity to avoid making payments under the judgment that has been given against them, though for the first time today I am being told – and I think the first time the court has ever been told – that there are other creditors with a total of some $15.7 million outstanding. One of the other creditors is likewise a judgment creditor under an English commercial Court judgment made by Flaux J."*

46.   In the light of the liquidation and the application for recognition, Mr. Justice Cooke transferred all the applications before him to the Chancery Division.

47.   It is of concern to Flame that Primera has a substantial asset in the form of a debt due from TMT Asia in the sum of US$1,811,449.10 and Primera has failed to collect in this asset, by the issuing of an invoice. This is notwithstanding the fact it has previously been Primera's position that this was the only asset.

48.   The TMT Asia/Primera FFAs ran to the end of December 2009. The final payment to Primera was due to be made in the first week of January 2010. The scheme of the FFA contracts was that the amounts due for a particular month were calculated at the end of the month and an invoice issued. Payment is triggered by the invoice.

49.   Flame believes that the reason why no invoice has been issued is to prevent the bringing of an asset into the jurisdiction (ie the UK) to found a basis to wind up the company. Under the terms of the freezing injunction the payment by TMT Asia would have to be made to DLA's account pursuant to the freezing order, thus bringing the asset into the jurisdiction. At the hearing before Mr. Justice Cooke in relation to this matter in March 2010 Mr. Justice Cooke held in his judgment:

> "*I can see no good reason why the defendants have failed to issue the invoices unless it be to deprive the claimants or any other creditors of interest in respect of them, or to avoid a liquidation in this country*"

50.   The reason put forward by Primera is that the beneficial owner of the money is not the Company but Primrose who would not authorise the issuing of any invoice. On 3 November 2009, I received an email from Berwin Leighton Paisner on behalf of Primrose claiming to be the beneficial owner of all receipts due from TMT Asia. Primrose threatened to intervene in the freezing injunction proceedings but has never done so.

51.   The suggestion that Primrose is the beneficial owner of the money has never been substantiated. The following should be noted:

(1) The fact that Primera was not acting as principal but agent on behalf of Primrose was not raised until 21 October 2009 (ie after Judgment had been given in the UK in favour of Flame). It was not even suggested that Primera acted only as agent in the application to set aside judgment in default.

(2) The only evidence put forward by Primera in support of this proposition is a management agreement dated 1 June 2004 in respect of a particular vessel and an addendum dated 23 November 2007. Neither of these documents (if genuine) is evidence that Primrose was the principal in the TMT Asia contracts.

(3) That Primera was not beneficially entitled to the sums it received is inconsistent with the case put forward in the Greek proceedings namely that JPC Investments SA made an interst free loan of US$1.5 million to Primera and that it would be repaid by Primera asking its FFA counterpairtes to pay JPC Investments rather than Primera.

(4) I understand that Primrose sold its only asset the "Astradance" in August 2006 and appears not to have been a trading company thereafter. In those circumstances it is not clear that it was acting as principal in relation to any ongoing trading.

(5) Investigations have also revealed a close connection between the Primrose and Primera. I understand that Primera's finance manager is the sole director of Primrose and that Lloyd's Register records Primrose as having an address care of Primera and as being a subsidiary of Primera. DLA have confirmed that the account of Seadance Maritime Inc is the account used by Primrose to pay legal fees and that *its* legal fees are paid by Primrose. Incidentally, I note that notwithstanding the connections I have identified above a director of Primera felt able to swear an affidavit on 21 October 2009 that "*[the Company] has never had any beneficial or other similar affiliation witht the companies owning vessels that are under the management of the [Company]*"

52. As I have set out above, it has been Primera's position that the TMT Asia debt is its only asset. If this is the case it not clear why Primera has not been collecting it. In any event, it is not clear that this is in fact the case. I note that Primera has previously asserted that

the value of FFAs from defaulting counterparties of the Company are estimated to be in the region of approximately US$8-10 million.

53. It has also come to light during the course of these proceedings that the day after Flame obtained judgment against Primera, a company named Primera Maritime Corporation was incorporated in the Marshall Islands. There is some connection with Primera as Primera's lawyers have previously, incorrectly, referred to Primera as being incorporated in the Marshall Islands.

54. On 15 July 2009, shortly after Flame obtained judgment in England, Primera took steps to remove itself from the register in Greece. The sole director of the Company resolved for unstated reasons to request the Ministry of Mercantile Marine to recall the permit by which the office of the Company was established in Greece and to authorize Mr. Nikolasos Koronis, as its legal representative to file a petition to the Ministry in that respect. On 17 July 2009, Mr. Koronis signed such a petition and the Ministry of Merc Marine recalled the permit. It is possible that these steps were taken in an attempt to remove itself from the jurisdiction of a European Court.

55. I believe that the facts in this witness statement are true.

Dated 17 May 2010

Graeme Lloyd