IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| FLAME S.A., | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 1:10-cv-278 |
| | § | |
| v. | § | JUDGE RON CLARK |
| | § | |
| M/V LYNX, her engines, freights, apparel, | § | |
| appurtenances, tackle, etc. in rem, | § | |
| | § | |
| *Defendant*. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ALTER EGO

An English court granted judgment to Plaintiff Flame S.A. against Primera Maritime

(Hellas) Ltd., based on a "Forward Freight Swap Agreement"("FFSA").  An FFSA is essentially

a contract to perform shipping services in the future.  The judgment was subsequently recognized

by the United States District Court for the Southern District of New York in the amount of

$5,554,271.36.  Flame filed an *in rem* action in this District against Defendant M/V Lynx

pursuant to the Supplemental Admiralty and Maritime Claims Rules, asserting that the vessel

was owned by Primera or one of its alter ego subsidiaries, including, but not limited to, Claimant

Camela Navigation, Inc.  This court issued a warrant, and the Lynx was arrested in this District.

Camela timely filed a motion to vacate the arrest warrant under Supplemental Admiralty

Rule E(4), asserting that Flame had no claim against it because it was not an alter ego of Primera.

The court held two hearings on May 18 and June 2, 2010. After considering the evidence

presented and the arguments of the parties, the court concluded that Flame had demonstrated that

Camela was an alter ego of Primera, and denied the motion to vacate the arrest. The court held a final hearing on July 27, 2010. Based on all the evidence presented, the court concludes that a preponderance of the evidence does not support a finding that Camela was an alter ego of Primera.

## I. BACKGROUND

On September 11, 2008, Flame and Primera Maritime (Hellas) Ltd. entered into a Forward Freight Swap Agreement ("FFSA"). The FFSA was a contract which provided for payments to be made each month during the year 2009, depending on movements in the rates that were published for certain ocean shipping routes by the Baltic Exchange. Primera failed to make its January 2009 payment. Flame terminated the FFSA and claimed payment pursuant to a contractual formula calculated in the FFSA. Decl. Linos Choo, Camela Hearing Ex. 49, at ¶ 4.

Flame commenced proceedings in England's High Court of Justice, Queens Bench, Commercial Court ("Commercial Court") on March 31, 2009. *Id.* at ¶ 5; *see also* Flame Hearing Ex. B. Judgment was entered on June 18, 2009 in favor of Flame in the amount of $5,554,271.36. *Id.* This was a final judgment. Pl. Resp. Mot. Vacate, at 2 [Doc. # 9].

Flame next sought and obtained recognition of the English judgment in the United States District Court for the Southern District of New York. Flame Hearing Ex. C. To enforce the Southern District judgment, Flame filed an *in rem* action in this court pursuant to Supplemental Admiralty Rule C against the M/V Lynx on May 13, 2010. The vessel was arrested the same day, following issuance of a warrant by this court. Docs. # 3, 4. Flame alleged that the Lynx was operated, managed, or controlled by Primera or one of its alter ego subsidiaries, including, but not limited to, Camela.

On May 16, 2010, Camela appeared, claiming to own the Lynx, and filed a motion to dismiss the Complaint and vacate the arrest warrant. After a hearing on May 18, the court granted Flame's motion to convert the action from an *in rem* proceeding under Supplemental Admiralty Rule C, to an *in personam* action for attachment and garnishment under Supplemental Rule B. The court directed that certain discovery requested by Flame be provided by Camela and, because Camela claimed that delay was likely to be ruinous, set a second hearing for June 2, 2010 to dispose of the motion to vacate. The vessel remained arrested, pending the June 2 hearing. *See* Doc. # 12.

After considering the evidence presented and the arguments of the parties at the June 2 hearing, the court concluded in its June 22, 2010 Order that the FFSA was a maritime contract, and that the court had admiralty jurisdiction under 28 U.S.C. § 1333(1) to order the arrest of the vessel in aid of the judgment recognized by the district court in the Southern District of New York. The court found that Primera's attempts to dissipate assets and avoid the judgment of the English court constituted fraud or injustice that made it appropriate to examine whether or not Camela is an alter ego of Primera. Considering the evidence available at this initial hearing under Supplemental Admiralty Rule E(4)(f), the court concluded that Flame had presented sufficient evidence to find that Camela is an alter ego of Primera, and denied the motion to vacate the arrest. The court also denied Camela's motion for security under Supplemental Rule E(2)(b). Doc. # 35.

After the June 22 Order was issued, several other parties intervened. On June 25, 2010, D'Amico Dry Limited filed an Intervenor Complaint under Rule B, based, like Flame's claim, on an English judgment it had obtained against Primera. Doc. # 36. A writ of attachment was

3

issued the same day. Doc. # 40. A second Intervenor Complaint under Rule C was filed on June 30 by Transportacion Maritima Mexicana, S.A. de C.V. ("TMM"), based on Camela's alleged breach of the parties' time charter. Doc. # 45. A third Intervenor Complaint under Rule B was filed on July 8 by Charbons et Fuels SA, based on a case Charbons had recently commenced against Primera in the English courts for breach of the parties' FFSA. Doc. # 54. Following a hearing on July 14, 2010, in which the court denied Camela's various motions to dismiss the Intervenors and vacate D'Amico's writ of attachment, two warrants for arrest were also issued in Charbons's and TMM's names against the Lynx. Docs. # 71, 72.

Following the July 14 hearing, the court issued an Order directing the United States Marshal to release the Lynx upon Camela's posting of a bond in the amount of $16,500,000 plus interest at 6% annually. Doc. # 80. The bond has not been paid to date, and the vessel remains arrested.

The court held a hearing on July 27, 2010, to render a final determination as to whether Camela is the alter ego of Primera. Flame and Camela subsequently stipulated to dismissal of their claims and counterclaims against each other, as well as vacateur of Flame's warrant against the Lynx. Docs. # 86, 87. D'Amico and Charbons still have pending claims, which are also based on the theory that Camela is Primera's alter ego.

## II.  BURDEN OF PROOF

It must be demonstrated, by a preponderance of the evidence, that Camela is the alter ego of Primera. *Hawknet Ltd. v. Overseas Shipping Agencies*, 2009 WL 1309854 at *2 (S.D.N.Y. May 6, 2009) ("Here, the Court held an initial hearing, pursuant to Rule E(4)(f) in order to establish whether the plaintiff had made a prima facie showing . . . Now that a Rule E(4)(f)

hearing has been held and discovery has taken place, the Court believes that a standard of proof higher than simply proving a prima facie case should be required of plaintiff. Consequently, we find that plaintiff must show, by a preponderance of the evidence, that TOM Shipping is an alter-ego of MOS in order to maintain its attachment of TOM's funds.").

Taking a somewhat similar approach in this case, the court held two hearings under Supplemental Admiralty Rule E(4)(f) and set out in its June 22 Order the analysis of the evidence before it at that time. *See* Doc. # 35. Nevertheless, that analysis did not finally decide the matter. The hearing on July 27 was the final hearing on the issue of alter ego.

## III. DISCUSSION

The question before the court is whether the evidence demonstrates, by a preponderance of the evidence, that the corporate veil between Primera and Camela should be pierced. The court will not revisit here the question of whether the Intervenors have a claim within the court's admiralty jurisdiction. This was discussed at length in the June 22, 2010 Order with respect to Flame's FFSA, in which the court concluded that an FFSA is a maritime contract. Doc. # 35, at 5-8.

### A.    Applicable Law

Three of the arresting parties' claims are based on contracts with, and/or judgments against, Primera. The Lynx is owned by Camela. To justify arresting the Lynx to satisfy these claims, the arresting parties must prove that Camela is an alter ego of Primera. Courts have considered various factors in analyzing alter ego status. *See, e.g., Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 n.2 (5th Cir. 2000) (twelve factors); *Sabine Towing & Transp. Co., Inc. v. Merit Ventures, Inc.*, 575 F. Supp. 1446-48 (E.D. Tex. 1983) (fifteen factors). However, the

corporate form will not be disregarded unless "the facts are such that an adherence to the fiction of the separate existence of the corporation would . . . sanction a fraud or promote injustice." *Edwards Co., Inc. v. Monogram Indus., Inc.*, 730 F.2d 977, 980-81 (5th Cir. 1984) (internal quotations omitted) (alteration and emphasis in original); *see also United States v. Jon-T Chemicals*, 768 F.2d 686, 691-92 (5th Cir. 1985).

It is sometimes argued that actual fraud must be shown. However, in this Circuit, the test may be met by a showing of fraud or injustice, such as an illegal act or misuse of the corporate form. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.32d 411, 416-17 (5th Cir. 2006).

## B.     Fraud or Injustice

### 1.     *Findings of fact*

The court makes the following findings of fact[1]:

1.      On September 11, 2008, Flame and Primera Maritime (Hellas) Ltd. entered into a Forward Freight Swap Agreement ("FFSA"). Flame Hearing Ex. T-1.

2.      Flame commenced proceedings in England's High Court of Justice, Queens Bench, Commercial Court ("Commercial Court") on March 31, 2009. *Id.*, Ex. B. Judgment was entered on June 18, 2009 in favor of Flame in the amount of $5,554,271.36. *Id.*

3.      A series of agreements entered into by Primera, some of which were signed by Paul Coronis on behalf of Primera, allowed payments to be made to Primrose Shipping Ltd., a

---

[1]Flame submitted Exhibits A-T in advance of the June 2 hearing, some of which were admitted. In these findings of fact, the court makes reference to several Flame exhibits that were not formally admitted at that hearing; however, all of the referenced Flame exhibits were attached to Flame's May 18, 2010 response to Camela's motion to vacate, Doc. # 9, and were referenced at the earlier May 18 hearing. Camela submitted Exhibits 1-51 in advance of the June 2 hearing, Exhibits 52-56 during the June 2 hearing, and Exhibits 57-168 in advance of the July 27 hearing. Some of the exhibits were admitted during the June 2 hearing, and the court considered all exhibits submitted by Camela for the July 27 hearing (i.e., Exhibits 57-168) admitted. In the interest of clarity, the court refers to exhibits submitted at both the June 2 and July 27, 2010 hearings without distinguishing between the two hearings. Citations to the transcript are to the July 27, 2010 hearing, unless otherwise noted.

company controlled by the Coronises (*see id.*, Ex. T-7), instead of to Primera, in order to avoid claims of Flame and other creditors in England:

a. TMT Asia Ltd. owed Primera $709,242.98 under an FFSA for September 2009. *Id.*, Ex. R, at ¶ 19.

b. Primera, after first failing to issue invoices for payment so funds would be unavailable to creditors, issued an invoice to TMT for the September 2009 amount due. TMT was told to pay the funds to an account in the name of Primrose Shipping, Ltd. *Id.*, Ex. R, at ¶ 20.

c. TMT made this payment by entering into a "netting off" agreement with Primera and Meadway Shipping and Trading Co. On October 6, 2009, Paul Coronis sent an email to individuals at TMT and Meadway confirming this agreement between the parties. *Id.*, Exs. L, R at ¶ 21.

d. This agreement noted that Meadway owed a debt to TMT in the amount of $508,072.46. Under the agreement, TMT would deduct $508,072.46 from its debt with Primera—leaving a balance of $201,170.52—and, in return, Meadway would pay Primera $406,457.96. *Id.*, Exs. L, R at ¶ 22. The money that both TMT and Meadway would pay Primera was actually paid to the Primrose account. *Id.*, Ex. R at ¶¶ 25, 26.

e. The amount Meadway was to pay to the Primrose account was apparently later reduced to $388,228.98. *Id.* at Ex. M.

f. The sole director of Primrose, Christos Gerogopoulos, is also an employee of Primera. Camela Hearing Ex. 99, ¶ 5(a).

g. As a result of this arrangement, all three parties benefitted:

   i. TMT discharged $508,072.46 of its debt to Primera through Meadway's $406,457.96—later reduced to $388,228.98—payment to the Primrose account.

   ii. Meadway's $508,072.46 debt to TMT was discharged by paying $388,228.98 to the Primrose account.

   iii. As these funds were paid to the Primrose account, instead of to Primera directly, they were not assets which could be seized by Primera's creditors.

4. When Flame became aware of the Meadway/TMT/Primera agreement, it petitioned the Commercial Court for a worldwide freezing order, which was granted on October 16,

2009.  On October 30, the Commercial Court held a hearing in which Judge Mackie concluded that the money due to Flame under the FFSA would be held by Primera's London solicitors pending further order.  Flame Hearing Ex. T-10, at ¶ 3.

5.    In the October 30 ruling, Judge Mackie stated that he was:

> extremely sceptical about the commercial bona fides of some of the transactions given, in particular the role played by Primrose . . . It seems clear to me that the claimants should have their money.  I recognise that the risk of dissipation of itself is not enough, and it is the object or effect of that dissipation which is the issue, but nonetheless an order can and should be made. [The English spelling of certain words has been retained]

*Id.*, Ex. T-10, at  ¶ 1.

6.    As a condition of maintaining the October 30 freezing order, Flame was required to instigate insolvency proceedings against Primera.  Tr. at 41:15-19.  Although Judge Mackie's order required Flame to initiate such proceedings by 4:30 p.m. on January 28, 2010, Flame did not until well after that deadline had passed.  *Id.* at 43:5-16.   The January 28 deadline was later amended to February 12, 2010.  Camela Hearing Ex. 118.  Camela's witness, English solicitor Linos Choo, stated at the July 27 hearing that this is the equivalent of initiating an involuntary bankruptcy against a debtor party under United States law, where the debtor's unpaid creditors force the debtor into bankruptcy.  Tr. at 42:7-18.

7.    During a March 8, 2010 hearing in the Commercial Court, Justice Cook stated the following:

> I said once that I am not the slightest bit impressed with anything your clients [Primera] have done at any stage during this exercise, and in the ordinary way, along with Judge Mackie and everybody else, I would continue any freezing injunction for as long as was necessary, because I regard your clients as having done their utmost to dissipate assets and avoid legitimate obligations.

Flame Hearing Ex. T-17, at 296.

8.    Primera entered into voluntary liquidation in Liberia on March 5, 2010.  Camela Hearing Ex. 132, at ¶ 2.  It then applied for the recognition of the Liberian liquidation proceedings in the Chancery Division of the High Court of Justice.  *Id.* at ¶ 8.  A hearing was set for May 11, 2010 in the Chancery Division.  *Id.*  A further hearing on the liquidator's application for recognition of the Liberian liquidation under the Cross Border Insolvency Regulations is set for October 2010.  Tr. 23:3-7.

9.    Justice Cook questioned the Liberian liquidation proceeding on March 8, 2010, stating that "There is a question of confidence here, is not there?  Those of us who have spent our lives dealing with Liberia in one way or the other may have varying degrees of confidence about how matters are dealt with in Liberia."  Flame Hearing Ex. T-17, at 298.

10.   Justice Cook went on to state that he "recognise[d] the difference in a liquidation situation, particularly where you have Cross-Border Insolvency Regulations and the position for ordinary management."  *Id*.

11.   Justice Cook stated in his approved judgment[2] that, "I have very little doubt that the history of events puts the defendants [Primera] in a bad light.  It seems to me that they have taken every possible opportunity to avoid making payments under the judgment that has been given against them . . . ."  Camela Hearing Ex. 132, at ¶ 4.

12.   The judgment also states that although there were sums owed to Primera by TMT Asia, "the defendants [Primera] have not issued invoices which would give rise to a crystallisation of those debts and, as a consequence, no interest can run in relation to them . . . I can see no good reason why the defendants have failed to issue the invoices unless it be to deprive the claimants or any other creditors of interest due in respect of them, or to avoid a liquidation in this country."  *Id.*, Ex. 132, at ¶¶ 4-5.

13.   Judges in the English court system do not make comments about litigants lightly, and are serious about the comments they make.  Tr. at 54:20-56:12.

   2.    *Analysis*

Although the court is not bound by the dicta of an English court, the statements of Judge

Mackie and Justice Cook, members of the High Court of Justice, Queens Bench, Commercial

Court, are compelling.  Both believed Primera to be deliberately avoiding its obligations to

creditors by engaging in sham transactions with Meadway and TMT Asia, and expressed some

degree of concern about the Liberian liquidation.

Camela made several arguments at the July 27 hearing which it failed to bring out at the

May 18 and June 2 hearings, despite ample opportunity to do so.  For example, Camela pointed

---

[2]As explained during the July 27 hearing by Camela's witness, English solicitor Linos Choo, judgments are handed down orally in the English system.  An approved judgment is the approved transcript of the oral judgment, available on request.  Tr. at 60:12-61:3.

out that as a condition of Judge Mackie's October 30, 2009 freezing order, Flame was to instigate involuntary liquidation proceedings against Primera by January 28, 2010. This date was later amended to February 12, 2010. Camela Hearing Ex. 118. Flame did not commence insolvency proceedings until well after that date; in the interim, Primera commenced a voluntary liquidation proceeding on March 4, 2010 in Liberia, the country in which it is incorporated.

Camela's witness, English solicitor Mr. Choo, whose live testimony was not presented to the court until the July 27 hearing, characterized Primera's initiation of a voluntary liquidation proceeding in its home country as the only responsible action that Primera could have taken under the circumstances. Tr. at 43:17-44:20. Mr. Choo also pointed out that Liberian law is based on United States law—specifically that of Delaware—and that the Liberian liquidator has excellent credentials.[3] Tr. at 65:10-66:4. Mr. Choo further stated that under the terms of the October 30 freezing order, Primera was to provide information about its assets exceeding $10,000. In a November 5, 2009 affidavit, a director of Primera, Hercules Grigoris, submitted an affidavit that purported to list all such assets. Camela Hearing Ex. 117. This affidavit did not include the Lynx, and has not been challenged. Tr. at 67:4-22.

The court concludes that the arresting parties have met their burden to demonstrate that continuing to treat Camela as a separate entity would promote injustice. While the court's concerns regarding the Liberian liquidation have been somewhat lessened by Camela's presentation at the July 27 hearing, there remains strong evidence in the record that Primera has

_____

[3]According to Mr. Choo, the Liberian liquidator, H. Barney Sherman, is a senior partner at Sherman & Sherman, has a master's degree from Harvard University, frequently gives expert testimony on Liberian law and process in United States courts, and was the liquidator of Citibank in Liberia. Tr. at 65:14-66:2.

attempted to dissipate assets through the Meadway/TMT agreement.

Under these facts, it would be unjust to permit Primera to escape its legal obligations by placing one of its assets in the hands of an alter ego subsidiary. However, even conclusive evidence, let alone proof by a preponderance of the evidence, of fraud or injustice is not enough to establish a link between corporations. The natural urge to compensate victims of one corporation's lawless acts does not justify ignoring the corporate form of another.

**C.    Do the Connections Between Primera and Camela Make Camela an Alter Ego of Primera?**

Different courts articulate various numbers of factors for the alter ego test. The parties not having urged the use, or presented evidence, of other factors, the court will utilize the twelve factor test set out in *Oxford Capital*:

> (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.

1.    *Factor 1—The parent and subsidiary have common stock ownership*

a.    *Findings of fact*

The court makes the following findings of fact with respect to this factor:

1.    Camela Navigation was incorporated on March 16, 2006 in the Marshall Islands. Camela Hearing Exs. 1, 29.

2.    On March 16, 2006, Camela entered into a Shipbuilding Contract with INP Heavy Industries Co., Ltd., whereby INP built the ship at issue in this case, the M/V Lynx. The contract was signed by Paul Coronis, on behalf of Camela. *Id.,* Ex. 9, at 63.

3. The contract contained a provision that Camela was to provide INP with an irrevocable corporate guarantee issued by Primera Maritime (Hellas) Ltd. within ten days from signing the contract. *Id.*, Ex. 9, at 44. According to the testimony of Paul Coronis at the July 27, 2010 hearing, he made a special request to his father, Nikolaos Coronis, to provide the guaranty. Tr. at 123:4-16.

4. On October 27, 2008, the M/V Lynx was delivered by the builder, SE Kwang Heavy Industries, Co., to Camela. Ioannis Kontodimopoulos signed on behalf of Camela. Camela Hearing Ex. 8. Mr. Kontodimopoulos is listed as an employee of Primera for the years 2008 and 2009. Flame Hearing Exs. S-21, S-22.

5. Mr. Kontodimopoulos took delivery of the vessel because he was an experienced individual that Mr. Coronis trusted, and that his travel expenses and fees were paid by Camela. Tr. at 127:6-129:2.

6. According to Sea-web, the Lloyd's Register of ships online, the Lynx is part of Primera's group owned, shipmanaged, operated, and combined fleets. Camela Hearing Ex. 99, at GL8, 25-27. According to Mr. Choo, the Lloyd's service is a maritime investigation unit that provides information on companies or vessels at a party's request, and is fairly well recognized by maritime law firms. Tr. at 90:16-92:8.

7. On November 28, 2008, Paul Coronis received 85 registered shares of Camela, or 17% of total authorized and issued stock. Camela Hearing Ex. 15. Mr. Coronis remains a shareholder of Camela, as stated in his May 31, 2010 affidavit. Camela Hearing Ex. 43, at ¶ 2.

8. Paul Coronis's declaration states that he is not a shareholder of Primera, and his hearing testimony corroborates this. Camela Hearing Ex. 43, at ¶ 3 (mislabeled as ¶ 4); Tr. at 108:6-8. Mr. Coronis also submitted a resignation letter from the Primera Board of Directors dated November 15, 2008. Camela Hearing Ex. 50. However, an October 8, 2009 email from Mr. Coronis to individuals at Meadway Shipping and Trading Co. discusses the details of an agreement between Primera, Meadway, and TMT Asia Ltd. Flame Hearing Ex. T-6. Mr. Coronis's email address is given as "Pcoronis@primera.com." *Id.*

9. Although Paul Coronis submitted a resignation letter on November 15, 2008, Mr. Coronis conducted business with Meadway and TMT on behalf of Primera as late as October 2009. *Id.* at Exs. L, M, T-6.

10. Chemnav Shipmangement Ltd. is the manager of the M/V Lynx. Camela Hearing Ex. 17. Paul Coronis was, as of March 26, 2008, the legal representative of Chemnav Shipmanagement Ltd. Flame Hearing Ex. S-19.

11.     Chemnav Shipmanagement and Primera share the same corporate address. *See, e.g.*, Flame Hearing Ex. F. The two companies are on separate floors of the building, and Chemnav Shipmanagement has a lease for its space. Tr. at 177:19-179:19; Camela Hearing Ex. 169. The building in which both companies are located is owned by Paul Coronis and his siblings. Tr. at 197:19-198:6.

12.     The incorporation fee for Chemnav Shipmanagement in Greece was $2,000 United States dollars. One requirement of incorporation is proof that $2,000 has been converted to Euros. The transfer of the Euros was made by Primera. Camela Hearing Ex. 166, at 11; Tr. at 163:9-165:9. Paul Coronis later paid the $2,000 back to Primera. *Id.* at 164:22-165:1.

        b.      *Analysis*

Paul Coronis become a shareholder in Camela Navigation on November 28, 2008, holding 17% of the total authorized and issued stock. Although he stated in his own affidavit that he owns no shares of Primera and resigned from the Primera Board of Directors on November 15, 2008, Paul Coronis nevertheless continued to act on behalf of Primera with respect to the Meadway/TMT agreement as late as October 2009.

There is some indication that Primera and Camela have overlapping ownership. As discussed with respect to factor (2) below, there is a number of common directors, officers, and employees between the two, as well as with Chemnav Shipmanagement. As discussed with respect to factors (5), (7), and (10), there is some evidence that Primera financed both Camela, by guarantying the shipbuilding contract for the Lynx, and Chemnav Shipmanagement, by paying—albeit temporarily—the $2,000 establishment fee. A Primera employee took delivery of the Lynx, and Primera and Chemnav Shipmanagement share the same corporate address. On the other hand, Camela presented evidence that Ioannis Kontodimopoulos was acting as a Camela subcontractor, rather than a Primera employee, when he took delivery of the vessel, and that

Primera and Chemnav occupy separate offices on different floors of the building. Chemnav has a separate lease for the space.

Taken together, this evidence weighs in favor of finding that Camela is Primera's alter ego.

2. *Factor 2—The parent and subsidiary have common directors or officers*

a. *Findings of fact*

The court makes the following findings of fact with respect to this factor:

**Paul Coronis**

1. Paul Coronis was the director of Primera until at least November 15, 2008. *See, e.g.*, Flame Hearing Ex. O; Camela Hearing Ex. 50. Although Mr. Coronis submitted a resignation letter on November 15, 2008, Mr. Coronis conducted business with Meadway and TMT on behalf of Primera as late as October 2009. Flame Hearing Exs. L, M, T-6.

2. Paul Coronis is a Camela shareholder, officer, and director. Camela Hearing Exs. 10, 23, 24, 43. He is the "notify party" for Camela on a loan agreement for the M/V Lynx between HSH Nordbank and Camela dated October 27, 2008: the address for notices relating to the mortgage is "Camela Navigation, Chemnav Inc., c/o Primera Maritime Ltd." Flame Hearing Ex. F, at clause 33.2. Notices are to be sent to the attention of Paul Coronis. *Id.* At the time of the mortgage, the Chemnav Shipmanagement offices were not completed and Paul Coronis was still working at Primera. Tr. at 180:4-182:4.

3. Paul Coronis is a director and officer of Chemnav. He is also its proxy and legal representative. Flame Hearing Exs. Q, at ¶¶ 2-4; S-9. Mr. Coronis also countersigned a Facility Agreement between Chemnav and HSH Nordbank dated May 2008. *Id.*, Ex. H, at 13260912 v.6.

**Nikolaos Coronis**

4. Nikolaos Coronis is listed as the legal representative of Primera in 2009 and 2008. Flame Hearing Exs. S-21, S-22.

5. Nikolaos Coronis was a director and officer of Camela until his resignation on January 11, 2009. Camela Hearing Exs. 23, 24, 45. He signed Camela's power of attorney on

October 15, 2008. *Id.* at Ex. 24. Paul Coronis asked his father to act as director because he trusted Nikolaos to sign documents in his absence. Tr. at 128:21-129:8.

6. Nikolaos Coronis countersigned a Facility Agreement between Chemnav and HSH Nordbank dated May 2008. Flame Hearing Ex. H, at 13260912 v.6.

7. Nikolaos Coronis signed the management declarations for Chemnav's first three vessels as director. Flame Hearing Ex. Q, at ¶ 5.

8. Nikolaos Coronis signed a preliminary management contract on December 22, 2008, between Chemnav and Camela regarding the Lynx on behalf of Camela. Flame Hearing Ex. S-12.

**Evangelos Biaractaris**

9. Evangelos Biaractaris is a lawyer who countersigned a Facility Agreement between Chemnav and HSH Nordbank dated May 2008 "for and on behalf of Primera Maritime (Hellas) Limited." Flame Hearing Ex. H, at 13260912 v.6, 4-5.

10. Mr. Biaractaris is a director and officer of Chemnav. Flame Hearing Ex. Q, at ¶¶ 3-4.

11. Mr. Biaractaris signed an April 23, 2007 International Swap Dealers Association Master Agreement between Camela and HSH Nordbank AG on behalf of Camela. Flame Hearing Ex. G, at 29. He did the same on a loan agreement for the M/V Lynx between HSH Nordbank and Camela dated October 27, 2008. *Id.* at Ex. F.

 b. *Analysis*

With respect to **Primera**, the above findings of fact demonstrate that Paul Coronis was a director until November 15, 2008. While he submitted a resignation letter on that date, he continued to conduct business with Meadway and TMT, on behalf of Primera, as late as October 2009. Nikolaos Coronis was listed as Primera's legal representative in 2008 and 2009. Evangelos Biaractaris countersigned the May 2008 Facility Agreement between Chemnav and HSH Nordbank on behalf of Primera. Although Mr. Biaractaris is an attorney, he acted as Primera's agent when he signed this agreement "for and on behalf of Primera."

With respect to **Camela**, Paul Coronis is a Camela shareholder, officer, director, and "notify party" on the Lynx mortgage. Notices were to be sent to his attention, at "Camela Navigation, Chemnav Inc.[4], c/o Primera Maritime Ltd." Paul Coronis testified during the July 27 hearing that at the time the mortgage was signed, Chemnav's offices had not yet been completed and he was faced with having notices set to him either at his home address or via his then-employer, Primera. He chose the latter.

Nikolaos Coronis was a director and officer of Camela until his resignation on January 11, 2009. He signed Camela's power of attorney in October 2008, and signed the preliminary management contract between Chemnav and Camela regarding the Lynx on behalf of Camela in December 2008. Evangelos Biaractaris signed an April 23, 2007 ISDA Master Agreement between Camela and HSH Nordbank on behalf of Camela, as well as the October 2008 Lynx mortgage agreement. Again, Mr. Biaractaris's signing of these documents is in the manner of an agent, rather than as simply Camela's counsel. *See, e.g.*, Flame Hearing Ex. G at 29, Ex. F at 127 ("Signed by Evangelos Biaractaris for and on behalf of Camela Navigation, Inc.").

Finally, with respect to **Chemnav**, Paul Coronis is a director and officer, as well as its proxy and legal representative. He, along with Nikolaos Coronis, countersigned the May 2008 Facility Agreement between Chemnav and HSH Nordbank. Nikolaos Coronis also signed the

---

[4]Chemnav Inc. is a shell or holding company which currently has no assets and engages in no business. It was originally envisioned as a holding company or parent for the four vessels Camela owns, but never materialized. Tr. at 183:3-185:19. This, not Chemnav Shipmanagement, is the company referred to in the minutes of the January 10, 2009 Board of Directors meeting for Camela and discussed by the court in its prior Order. Whenever the court references "Chemnav" is this Order, therefore, it refers to "Chemnav Shipmanagement Ltd." unless otherwise specified. For reasons beyond the court's understanding, Camela failed to make this distinction clear in the June 2 hearing.

management declarations for Chemnav's first three vessels as director. Evangelos Biaractaris is a director and officer of Chemnav.

These three companies are intertwined in other ways as well. The evidence demonstrates that Chemnav's establishment fee was temporarily paid by Primera. Primera was the corporate guarantor for Camela on the Lynx shipbuilding contract and, when the Lynx was delivered on October 27, 2008, a Primera employee—Ioannis Kontodimopoulos—signed on behalf of Camela. At the same time, Camela presented evidence that Ioannis Kontodimopoulos was acting as a Camela subcontractor, rather than a Primera employee, when he took delivery of the vessel. Primera and Chemnav have offices, albeit on different floors, in the same building. This building is owned by Paul Coronis and his siblings.

Taken together, this evidence does indicate some degree of overlapping management between the companies both before and after September 11, 2008, the date that the Flame/Primera FFSA in question was signed. At a minimum, it establishes that Paul Coronis currently has an interest in Camela Navigation and, despite his purported resignation from Primera in November 2008, continued as late as October 2009 to conduct business on behalf of Primera. Nikolaos Coronis is currently the legal representative of Primera, although he purported to resign from Camela in January 2009. Evangelos Biaractaris, a director and officer of Chemnav, conducted business on behalf of both Primera and Camela. He was not simply acting as an attorney, advising various clients; rather, Mr. Biaractaris was signing important documents as the authorized agent of Primera in May 2008 and of Camela in 2007 and 2008. All three have involvement as a director, officer, or signing party on behalf of Chemnav, a company whose

establishment fee was temporarily paid for by Primera and which has corporate offices in the same building as Primera.

The court therefore concludes that this factor weighs in favor of finding Camela to be Primera's alter ego.

3.　　*Factor 3—The parent and subsidiary have common business departments*

a.　　*Findings of fact*

The court incorporates by reference the above findings of fact.

b.　　*Analysis*

The evidence demonstrates that Primera was the corporate guarantor for Camela on the Lynx shipbuilding contract. When the Lynx was delivered on October 27, 2008, Ioannis Kontodimopoulos, a Primera employee during 2008 and 2009, signed on behalf of Camela, although Camela presented evidence that he was acting as a Camela subcontractor, rather than a Primera employee, at the time. Paul Coronis is the "notify party" for Camela on the October 27, 2008 loan agreement for the Lynx between HSH Nordbank and Camela, and notices were to be sent to "Camela Navigation, Chemnav Inc., c/o Primera Maritime Ltd." Mr. Coronis did offer an explanation for this, stating that when the mortgage was signed, the Chemnav offices were not yet completed and he was still working for Primera.

Both Paul and Nikolaos Coronis countersigned a Facility Agreement between Chemnav and HSH Nordbank dated May 2008. Evangelos Biaractaris also countersigned the May 2008 Facility Agreement "for and on behalf of Primera Maritime (Hellas) Limited." Mr. Biaractaris also signed an April 23, 2007 International Swap Dealers Association Master Agreement

between Camela and HSH Nordbank AG on behalf of Camela, as well as the October 27, 2008 loan agreement for the Lynx between HSH Nordbank and Camela.

Taken together, these facts indicate somewhat that certain individuals conduct business for both Primera and Camela.  Not only was Primera the corporate guarantor for the Lynx's shipbuilding contract, but the vessel was signed for by a Primera employee upon delivery.  Paul Coronis is listed as the "notify party" on the Lynx's mortgage, and notices are to be sent to him "c/o Primera." Primera has the same corporate address as Chemnav, a company whose establishment fee was temporarily paid by Primera. Evangelos Biaractaris also wears many hats, signing on behalf of Primera in May 2008, and on behalf of Camela in April 2007 and October 2008.  Paul and Nikolaos Coronis both countersigned the May 2008 agreement for the benefit of Chemnav.  At the time, Nikolaos Coronis was listed as Primera's legal representative and a director and officer of Camela.  Paul Coronis was a Camela shareholder, director, and officer, a Chemnav director, officer, proxy, and legal representative, and the director of Primera.

On the other hand, individuals are not what are usually thought of as "departments." Primera and Chemnav have the same corporate address, but occupy separate offices on different floors.  Chemnav has its own lease.  Paul Coronis testified that he was still working at Primera and did not have corporate offices for Chemnav set up when he was listed as a notify party on the Lynx's mortgage.

The court therefore finds that this factor weighs only slightly in favor of an alter ego finding.

4. *Factor 4—The parent and subsidiary file consolidated financial statements*

   a. *Findings of fact*

1. Camela produced individualized financial statements prepared by a third-party auditor, PricewaterhouseCoopers, in advance of the July 27 hearing. Camela Hearing Ex. 151.

2. Camela files its own freight tax exemption filings in the United States. Tr. at 135:22-136:21.

3. Primera and Camela have never filed consolidated tax returns, nor do they keep consolidated financial records. *Id.* at 137:5-10.

   b. *Analysis*

At the prior hearing, Camela produced only a consolidated financial statement from 2008 for all four vessels it owned. The court drew a slight adverse inference against Camela with respect to its failure to produce 2009 financial records. At the July 27 hearing, Paul Coronis represented that when the request to turn over the documents was made by Flame, Camela's third-party auditor was in the process of conducting its inquiry. PricewaterhouseCooper's report for 2009 has now been produced to the court.

There is no indication in the financial records before the court that Primera and Camela filed consolidated financial statements. To the contrary, the undisputed testimony of Paul Coronis at the July 27 hearing established that Camela submits its own tax exemption filings in the United States, and that Camela and Primera have never filed consolidated tax returns.

The court therefore concludes that this factor weighs against a finding that Camela is Primera's alter ego.

5.      *Factor 5—The parent finances the subsidiary*

      a.      *Findings of fact*

The court incorporates by reference the above findings of fact.

      b.      *Analysis*

Primera was the corporate guarantor for Camela on the Lynx shipbuilding contract. When the Lynx was delivered on October 27, 2008, Ioannis Kontodimopoulos, a Primera employee during 2008 and 2009, signed on behalf of Camela. Chemnav was the Lynx's manager. Chemnav and Primera share the same corporate address. Paul Coronis is the "notify party" for Camela on the October 27, 2008 a loan agreement for the Lynx between HSH Nordbank and Camela, and notices were to be sent to "Camela Navigation, Chemnav Inc., c/o Primera Maritime Ltd." Paul and Nikolaos Coronis both countersigned a Facility Agreement between Chemnav and HSH Nordbank dated May 2008. Evangelos Biaractaris also countersigned the May 2008 Facility Agreement "for and on behalf of Primera Maritime (Hellas) Limited." Mr. Biaractaris also signed an April 23, 2007 International Swap Dealers Association Master Agreement between Camela and HSH Nordbank AG on behalf of Camela, as well as the October 27, 2008 loan agreement for the Lynx between HSH Nordbank and Camela.

The evidence establishes that Nikolaos Coronis, through his company Primera, guaranteed agreements for his son. While that made Paul Coronis's new venture possible, there is no evidence that Nikolaos or Primera advanced funds or financed Camela. It would be a stretch to say that piercing the corporate veil is justified merely because a parent, who controls an established corporation, is willing to help a child get a start in a new venture by guaranteeing an

agreement that is, at least initially, completely funded by shareholders of the child's new company.

These facts suggest that, while Primera might have had to pay off on its guarantee, that did not become necessary. There is no evidence that Primera advanced funds to Camela to finance the purchase of the Lynx or its ongoing operations. There is no indication that Primera made any of the payments on the HSH Nordbank loan. The court finds that this factor does not weigh in favor of an alter ego finding.

6. *Factor 6—The parent caused the incorporation of the subsidiary*

a. *Findings of fact*

The court incorporates by reference the above findings of fact.

b. *Analysis*

Primera paid Chemnav's establishment fee temporarily. Paul Coronis was the "notify party" for Camela on the October 2008 loan agreement for the Lynx, and Primera was the corporate guarantor for Camela on the Lynx shipbuilding contract.

Taken together, these facts indicate that Primera might have had a role in the incorporation of Chemnav; however, they do not speak to the question of whether Primera caused the incorporation of Camela. The evidence that Mr. Coronis was a "notify party" on the Lynx loan agreement and that Primera guaranteed the Lynx shipbuilding contract are relevant to other alter ego factors, but not this one. At best, the evidence demonstrates that Primera had a hand in incorporating Chemnav.

The court finds that this factor weighs against a finding of alter ego.

7. *Factor 7—The subsidiary operated with grossly inadequate capital*

a. *Findings of fact*

The court makes the following findings of fact with respect to this factor:

1. Camela produced financial statements for the years 2008 and 2009. Camela Hearing Ex. 151.

2. In these documents, Camela's assets, other than the vessel, total $962,870 for 2009. *Id.*, Ex. 151, at 5. Of this amount, $666,750 is restricted cash, meaning that it cannot currently be used to satisfy liabilities. *Id.* Camela's total comprehensive income for 2009 was $814,601, of which most—$799,681—was cash flow hedges. *Id.* at 6. Cash flow hedges are basically derivative contracts. *Id.* at 17.

b. *Analysis*

There is some indication in the financial records provided to the court that Camela is operating with inadequate capital. These records indicate that Camela's available assets—excluding the vessel and restricted cash—are $296,120. Camela's current ratio—i.e., the current assets to current liabilities—is 0.36; a high ratio indicates a good probability that a company can retire the current debts. As a general rule, a ratio of current assets to current liabilities of 2:1 is satisfactory, although ratios will vary from business to business. *See, e.g., In re O'Day Corp.*, 126 B.R. 370, 407-08 (D. Mass. 1991) (citing E. Faris, Accounting for Lawyers 270 (4th ed. 1982)).

"Undercapitalization is often critical in alter ego analysis . . . The fact that a subsidiary maintains what amounts to a 'zero balance' and relies exclusively upon another entity to service its debts, is strong evidence that the subsidiary lacks an independent identity." *Bridas*, 447 F.3d at 420. Although Camela appears to be operating with inadequate capital, it does seem to operate in the black, albeit not by a great margin. There is no evidence in the record that Camela relies

upon Primera to service its debts. The court therefore cannot characterize Camela as operating with grossly inadequate capital.

The court finds that this factor does not support a finding of alter ego.

8. *Factor 8—The parent pays salaries and other expenses of subsidiary*

    a. *Findings of fact*

The court makes the following findings of fact with respect to this factor:

1. The 2008-09 employee records of Chemnav list three (2008) or four (2009) employees, one of whom is Paul Coronis. Flame Hearing Exs. S-8, S-9. Evangelos Biaractaris is not one of the employees listed, even though he is a director and officer of Chemnav. *Id.,* Ex. Q, at ¶¶ 3-4.

2. The 2008-09 employee records of Primera do not list Paul Coronis as an employee. Flame Hearing Exs. S-21, S-22. However, Paul Coronis did not officially resign as the director of Primera until November 15, 2008, and continued acting on behalf of Primera by negotiating the Primera/Meadway/TMT agreement as late as October 2009. Camela Hearing Ex. 50; Flame Hearing Exs. L, M, T-6.

3. Paul Coronis testified at the July 27 hearing that the only employees of Camela are the crew onboard the Lynx, and that these employees are paid by Camela. Tr. at 146:13-147:7.

4. Camela has a number of insurance policies for the Lynx, and pays the annual premiums. *Id.* at 154:24-155:6; Camela Hearing Exs. 18-20. Primera has no rights under these policies, has made no payments on the policies, and approved claims are paid to Camela and/or the mortgage holder. *Id.* at 155:7-159:15.

    b. *Analysis*

Flame has presented evidence that two individuals—Evangelos Biaractaris and Paul Coronis—were doing work for companies that neither listed them as employees nor paid them. However, the evidence in fact demonstrates not that Mr. Coronis was being paid by the parent Primera, but that he was being paid either by Camela or Chemnav, or not at all.

With respect to Mr. Biaractaris, the evidence does imply that he was receiving compensation elsewhere—perhaps from the parent—for work done on behalf of Chemnav. Although Chemnav is not the subsidiary in question here, there is evidence in the record that Chemnav had its establishment fee temporarily paid by Primera.

It was unclear who paid Ioannis Kontodimopoulos's salary for his duties with respect to the Lynx. It is undisputed that Mr. Kontodimopoulos was a Primera, not a Camela, employee at the time the vessel was being constructed and when he took delivery of it. Tr. at 251:9-254:2. Camela argued that he was paid as a subcontractor or independent contractor, and that while there is no line item corresponding to his fee in Camela Hearing Exhibit 175, his fee is accounted for under the general heading "Other general expenses."

On balance, the court finds that this factor is neutral.

9. *Factor 9—The subsidiary receives no business except that given by the parent*

   a. *Findings of fact*

1. Camela has an exclusive chartering broker, George Blue, who manages Camela's contracts and charters, and finds employment for the vessel. Tr. at 133:5-15.

2. Camela does not receive any business through Primera., nor has Mr. Blue ever provided brokerage services to Primera *Id.* at 133:16-21.

   b. *Analysis*

Flame offered no evidence to contradict the testimony of Paul Coronis that George Blue is Camela's exclusive chartering broker, Camela does not receive any business through Primera, and Mr. Blue has never provided any brokerage services to Primera.

This factor weighs against a finding of alter ego.

10. *Factor 10—The parent uses the subsidiary's property as its own*

a. *Findings of fact*

The court incorporates by reference the above findings of fact.

b. *Analysis*

Paul Coronis was the "notify party" for Camela on the October 2008 loan agreement for the Lynx. Primera was the corporate guarantor for Camela on the Lynx shipbuilding contract, and, when the Lynx was delivered on October 27, 2008, Ioannis Kontodimopoulos, a Primera employee during 2008 and 2009, signed on behalf of Camela. Chemnav was the Lynx's manager. Primera paid Chemnav's establishment fee temporarily. Chemnav and Primera are housed in the same building, sharing the same corporate address.

At the same time, Primera and Chemnav have the same corporate address but occupy separate offices on different floors. Chemnav has its own lease. Camela presented evidence that Ioannis Kontodimopoulos was acting as a Camela subcontractor, rather than a Primera employee, when he took delivery of the Lynx. Paul Coronis testified that he was still working at Primera and did not have corporate offices for Chemnav set up when he was listed as a notify party on the Lynx's mortgage.

The court is cognizant of the Fifth Circuit's admonition not to elevate "the form over the substance" of the parties' relationship. *Bridas*, 447 F.3d at 418. While the evidence discussed above supports the court's findings with respect to alter ego factors (1) and (2), there is no evidence that Primera ever used the Lynx, or any other property of Camela, after the vessel was delivered. While Primera undoubtedly had a key role in the formation of Camela, there is no evidence that Primera has ever been involved in the day-to-day operations of the company, nor is

there evidence that Primera ever used the Lynx to transport any cargo or to meet its own

obligations.

The court therefore finds that this factor weighs against finding that Camela is Primera's

alter ego.

11. *Factor 11—The daily operations of the two corporations are not kept separate*

a. *Findings of fact*

The court incorporates by reference the above findings of fact.

b. *Analysis*

The relevant findings of fact and analysis on this factor are similar to factor (3), above.

Primera was the corporate guarantor for the Lynx's shipbuilding contract, and the vessel was

actually signed for by a Primera employee when delivered. Paul Coronis, a Camela officer and

director, is listed as the "notify party" on the Lynx's mortgage, and notices are to be sent to him

"c/o Primera." Primera is located in the same building as Chemnav. Evangelos Biaractaris

signed legal documents on behalf of Primera in May 2008, and on behalf of Camela in April

2007 and October 2008. Paul and Nikolaos Coronis both countersigned the May 2008 agreement

for the benefit of Chemnav. At the time, Nikolaos Coronis was listed as Primera's legal

representative and a director and officer of Camela. Paul Coronis was a Camela shareholder,

director, and officer, a Chemnav director, officer, proxy, and legal representative, and the director

of Primera.

On the other hand, Primera and Chemnav occupy separate offices on different floors of

the building. Chemnav has its own lease. Camela presented evidence that Ioannis

Kontodimopoulos was acting as a Camela subcontractor, rather than a Primera employee, when

he took delivery of the Lynx. Paul Coronis testified that he was still working at Primera and did not have corporate offices for Chemnav set up when he was listed as a notify party on the Lynx's mortgage. Despite overlapping directors and personnel, there is no evidence of Primera's involvement in Camela's daily operations, such as obtaining business, setting rates, determining or paying salaries, or purchasing necessaries for vessel operation.

The court therefore finds that this factor weighs against finding that Camela is Primera's alter ego.

12. *Factor 12—The subsidiary does not observe corporate formalities*

a. *Findings of fact*

The court incorporates by reference the above findings of fact.

b. *Analysis*

The evidence is that Paul Coronis, a Camela officer and director, is listed as the "notify party" on the Lynx's mortgage, and notices are to be sent to him "c/o Primera." Evangelos Biaractaris signed legal documents on behalf of Primera in May 2008, and on behalf of Camela in April 2007 and October 2008.

At the same time, Paul Coronis testified that he was still working at Primera and did not have corporate offices for Chemnav set up when he was listed as a notify party on the Lynx's mortgage. Camela holds Board of Directors meetings and keeps minutes. Camela files its own tax returns and exemptions.

The court therefore finds that this factor weighs against finding Camela to be Primera's alter ego.

## IV.  CONCLUSION

When making an alter ego determination, "the court is concerned with reality and not form, and with how the corporation operated.  Unlike the theory of agency, which interprets a contractual relationship, alter ego examines the actual conduct of the parent vis-a-vis its subsidiary."  *Bridas*, 447 F.3d at 416.  Here, those factors which support a finding of alter ego tend to be ones which speak more to Primera's role in initially helping to form and finance Camela—i.e., stock ownership (factor 1), common directors and officers (factor 2), and common business departments (factor 3).  Conversely, those factors which do not support piercing the corporate veil are those that go toward Primera's involvement in Camela's current, day-to-day operations—i.e., the parent and subsidiary file consolidated financial statements (factor 4), parental financing of the subsidiary (factor 5), the subsidiary operates with grossly inadequate capital (factor 7), the subsidiary receives no business except that given by the parent (factor 9), the parent uses the subsidiary's property as its own (factor 10), the daily operations of the two corporations are not kept separate (factor 11), and the subsidiary does not observe corporate formalities (factor 12).  In the end, the latter factors outweigh the former.

Recognizing that this may be a close question, the court concludes that there is insufficient evidence in the record to establish, by a preponderance of the evidence, that Camela is Primera's alter ego.  Primera's actions with respect to the Meadway/TMT agreement are evidence that Primera has attempted to defraud its creditors or to work an injustice against them.  However, with respect to piercing the corporate veil, factors 4, 5, 6, 7, 9, 10, 11, and 12 do not support finding alter ego.  Factors 1 and 2 weigh in favor of an alter ego finding, while factor 3 weighs slightly in favor.  Factor 8 is neutral.  On balance, the evidence simply fails to

demonstrate that the management, finances, and daily operations of Primera and Camela are sufficiently intertwined to justify piercing the corporate veil.

It is worth emphasizing that, despite two prior opportunities to present the evidence introduced at the July 27 hearing, Camela failed to lucidly present credible testimony, cogent argument, or even certain information requested by the court at either the May 18 or June 2 hearing. Were it not for Camela's local counsel, who unfortunately did not participate in the presentation of evidence or argument, the court doubts that it would even have had properly marked exhibits at these hearings.

Had Camela provided, for example, the very simple clarification that Chemnav Shipmanagement Ltd. and Chemnav Inc. were two separate entities prior to the July 27 hearing, the court would not have made its prior findings with respect to Camela's incorporation of Chemnav. Among other things, Camela failed to bring its exclusive chartering broker Mr. Blue to the court's attention, chose not to explain its theory that Ioannis Kontodimopoulos was a Camela subcontractor rather than a Primera employee when he took delivery of the vessel, did not clarify Paul Coronis's reason for listing himself as a notice party on the Lynx mortgage "c/o Primera," and did not timely provide the court with either relevant financial documents or the excuse proffered at the July 27 hearing for its failure to do so. Had all the testimony and documents presented at the July 27 hearing been before the court previously, the June 22 Order would have been different.

The warrant of arrest against the Lynx obtained by Flame has already been vacated. Doc. # 87. Because their claims against Camela and the Lynx are based upon claims against Primera and would require piercing of the corporate veil, it is ORDERED that the warrant of arrest of

Intervenor Charbons et Fuels SA [Doc. # 75], as well as the writ of attachment of Intervenor

D'Amico Dry Limited [Doc. # 42], are VACATED.  Because its claims are based on Camela's

own alleged breach of the parties' time charter agreement in connection with the arrest of the

Lynx, the warrant of arrest of Intervenor Transportacion Maritima Mexicana, S.A. de C.V. [Doc.

# 73] remains in effect.


So **ORDERED** and **SIGNED** this **6**   day of **August, 2010.**


_____
Ron Clark, United States District Judge